792 So.2d 160 (2001)
STATE of Louisiana
v.
Vernon K. LEDET.
No. 00-KA-1103.
Court of Appeal of Louisiana, Fifth Circuit.
July 30, 2001.
*164 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Donald Brown, Vince Paciera, Assistant District Attorneys, Gretna, LA, Attorneys for Plaintiff/Appellee.
Kevin V. Boshea, Louisiana Appellate Project, New Orleans, LA, Attorney for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., SOL GOTHARD, and CLARENCE E. McMANUS.
SOL GOTHARD, Judge.
The defendant, Vernon K. Ledet, appeals from his conviction for first degree murder and his sentence of life imprisonment without benefit of probation, parole *165 or suspension of sentence. For the following reasons, we affirm the defendant's conviction and sentence.
On January 16, 1997, the defendant was charged by bill of indictment with first degree murder of Thelma Hebert, a violation of La. R.S. 14:30. Prior to trial, the defendant filed a motion in limine to exclude PCR DNA evidence and DNA evidence resulting in mixed stains which was denied. On August 26, 1998, a Daubert[1] hearing was held, and the trial judge ruled on September 3, 1999 that the state's DNA expert was qualified to testify at trial and that the methods the expert used were scientifically valid. On December 6, 7, 8 and 9, 1999, the case was tried before a twelve-person jury which unanimously found defendant guilty as charged. Defendant filed a motion for judgment notwithstanding the verdict, or alternatively, motion for new trial, which was denied. The penalty trial was held and the jury could not reach a verdict on whether to sentence defendant to life imprisonment or give him the death penalty. Therefore, on February 4, 2000, the trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.

FACTS
On March 22, 1994, or in the early hours of March 23, 1994, Thelma Hebert, a 73-year-old black female who lived alone, died from injuries sustained as a result of being brutally beaten in her home located at 483 Ocean Avenue in Gretna. From the injuries, it was apparent that Hebert had defended herself as she was being beaten. During the investigation of Hebert's homicide, 61 people were interviewed, including Vernon Ledet and Michael Roussell, also known as "Michael Shorty" (hereinafter referred to as Michael Roussell or Roussell). However, Ledet, a 32-year-old black male, became the prime suspect. Ledet, who lived nearby at 437 Ocean Avenue, presented an alibi defense, claiming that on March 22, 1994, he was repairing a screen door at his sister's house. He stated that he then went home where he remained until the following morning. When the police noticed during the interview that Ledet had a fresh injury on one of his hands, Ledet claimed that he had cut his hand while installing the screen door. No other person interviewed had an open cut or wound.
Dr. Susan Garcia, who was qualified as an expert in forensic pathology, testified for the State that she performed an autopsy on Thelma Hebert. She stated that Hebert had sustained multiple instances of blunt trauma, primarily to her head, anterior or front portion of her face, neck, upper chest and back. Hebert had wounds on her right hand, forearm, and right lower leg, indicating that they were more likely than not defensive injuries. She had a laceration on her face, multiple bruises and abrasions on her face, front portion of her neck, her clavicles, and numerous abrasions and bruises of her upper back and right buttock. Hebert had extensive bleeding or hemorrhage into the right side and upper portion of the neck. Dr. Garcia testified that the tissue swelled so much above Hebert's vocal cords that she couldn't breathe; therefore, she asphyxiated, or died of lack of oxygen. Hebert had extensive injury to her head and scalp, and her entire scalp was full of recent hemorrhage. She had fractured ribs on the left side. Dr. Garcia stated that Hebert did not die instantaneously. She testified that it would have taken Hebert *166 quite some time to die, and that lack of consciousness would probably have occurred before actual death. Hebert probably died sometime on March 22 or the very early hours of March 23.
Sergeant Neal A. Giroir, a police officer with the detective division of the City of Gretna, testified for the State that, on March 23, 1994, at approximately 10:50 a.m., he received a call involving a homicide at 482 Ocean Avenue in Gretna. When he arrived at that location, Officers John Leal and Junius Rogers were securing the outside of the premises, a shotgun house, to prevent anyone from entering. Crime scene technician, Dwayne Munch, entered the residence with Sergeant Giroir. Giroir testified that upon entering the residence, he observed the living room in disarray, a sofa with numerous papers on it, and a desk which had drawers removed from it and were turned over, as if someone had been rifling through them. He stated that he proceeded to enter the second room, a bedroom, and observed the victim lying face up with her head in a northwesterly position and her feet in a southeasterly position, and she was partially clad in a dark blue knit-type pullover garment. The room was in disarray. There was a bed with a dresser drawer sitting on it, an overturned trash can, and clothing and other items on the ground. The dresser had blood splatters around the front. Sergeant Giroir made sure that the scene was not contaminated. The victim was identified by her sister, Antoinette Hebert.
Dwayne J. Munch, a police officer and crime scene technician with the Gretna Police Department, testified for the State, that on March 23, 1994, at approximately 10:50 a.m., he responded to a call at 482 Ocean Avenue regarding a homicide. He took photographs; collected evidence, hair and fiber; and dusted for fingerprints. None of the fingerprints could be matched to anyone. Munch stated that the scene was not contaminated in any way between the time that he got there and the time that he collected the evidence. When he collected the evidence, he put each item in its own bag and then sealed it and placed it in boxes. There was no chance that any of the evidence was contaminated. A few of the items collected were moist and appeared to contain blood. Those were collected in the usual fashion and then airdried on a hanger later on. The usual procedure is that each item would be placed on the hanger and wrapped with butcher paper to keep them separate from each other. If any substance dripped from the item, the butcher paper would have caught it. After the items were air-dried, they would have been repackaged into a bag and sealed back up. Munch testified that, although that was the usual procedure, he does not know if that was done in this case. Munch was asked to do a standard rape kit on Ledet which he did, and he collected clothing from Ledet. Munch recovered a bra from the scene which was located in the area where the body was laying. However, he admitted that none of the photographs of the victim taken at the crime scene showed a bra. There was a partial footprint outside of the back window that they took a photograph of. Munch took a cast of that footprint.
During the course of the investigation, Giroir saw a piece of plywood at Hebert's residence that was apparently used to close up a hole in the side of the house; a hole large enough for people and/or animals to enter. It was Giroir's opinion that the hole was the point of entry for the perpetrator. The perpetrator could not have come through the front door because it had been blocked by a shovel. There was a footprint on the plywood which Giroir thought was made when the perpetrator entered the residence.
*167 In the investigation of Hebert's death, Sergeant Giroir and 17 other officers interviewed 61 people, including Michael Roussell. The investigation of Hebert's homicide led Giroir to Vernon Ledet. Sergeant Giroir learned that Ledet lived at 437 Ocean Avenue, approximately one-half block and across the street from Hebert. Giroir questioned Ledet, who said that he had been at his sister's house on March 22 installing a screen door from 10:00 a.m. to 5:00 p.m. Ledet told Giroir that after he repaired the screen door, he stopped at a local convenience store, bought a couple of beers, went home where he lived with his mother and remained there until the next day. Sergeant Giroir noticed that Ledet had a fresh injury on one of his hands, either an open cut or wound of some sort. Ledet told Sergeant Giroir that he had injured his hand while installing the screen door. In a subsequent interview, Ledet told Giroir that he was a fifth degree black belt martial arts practitioner.
At a later date, Giroir requested and obtained voluntarily from Ledet, fingernail scrapings, head hair and pubic hair samples, shoes and clothing. Specifically, Giroir obtained from Ledet a pair of Carolina black boots, size 10-½ a pair of Adidas shoes, brown in color; a pair of Spaulding shoes, white in color; a black sweatshirt; a red sweatshirt; a pair of black jeans; and a pair of navy blue jeans. None of the items obtained from Ledet contained damp blood when they were collected. Giroir stated that he forwarded some of the items to the FBI Crime Lab in Washington, D.C.
William Cambre, a police officer with the Gretna Police Department, testified for the State that in January of 1995, the case involving the Hebert homicide was transferred from Sergeant Giroir to him. Pursuant to a search warrant, Cambre drew blood from Ledet. He sent the blood to the FBI so they could run DNA tests on it. Cambre also interviewed Michael Roussell and had blood drawn from him at West Jefferson Hospital on November 20, 1999.
Richard Buechele testified for the State that from 1989 through 1995, he was employed as an examiner in the materials analysis unit at the FBI laboratory in Washington, D.C. He was qualified as an expert in the field of materials analysis. Buechele stated that he was requested to examine two amber colored pieces of foam-like material and determine their composition and whether or not they were consistent with having originated from the same source. Buechele looked at State's exhibit number 45, labeled Q5 for FBI purposes, which contained debris represented to him as having originated from a sheet at the victim's residence. The pill box, labeled Q45 through Q52, was represented to him as having contained debris which was removed from the suspect's clothing. In each pill box was an amber, soft, meshy foam material. Buechele determined that the foam from the victim's sheet and the suspect's clothing matched in color, texture and composition and, therefore, could have come from a common source. He stated that if the foam from the victim's clothing and the suspect's clothing were put in front of him and mixed up, he could not tell the difference between the two.
Melissa A. Smrz testified for the State that she was employed as a supervisory special agent with the FBI in Washington, D.C. and was then assigned to the DNA analysis unit of the FBI laboratory. She was qualified as an expert in forensic serology and DNA analysis. Smrz stated that in her laboratory, there were two major types of DNA testing that they could do, RFLP, restriction fragment length polymorphism, and PCR, polymerase chain reaction. In this case, Smrz used the PCR base-type tests: polymarker, *168 DQA1, amelogenin and D1S80. Smrz testified that PCR testing was used throughout the forensic community, for paternity testing, and for research in this country and throughout the world. Smrz was the DNA examiner in this case; the serology work had already been done in the FBI laboratory. In this case, Smrz received and did DNA typing on a blood sample from Hebert; a blood sample from Ledet; a blood stain or stain that was removed from a brassiere that was reportedly from Hebert, or the crime scene, specimen Q33; a cutting from a pair of jeans that was reportedly from Ledet; the DNA or stain that was removed from a white tennis shoe, specimen Q43; a work boot shoe, specimen Q47; the other matching shoe, specimen Q48; and two sweatshirts, specimens Q49 and Q51.
Smrz testified that she was able to determine that male DNA was present on the tennis shoe, Q43. The results on the work boot shoe, Q47, were inconclusive. Her tests showed that the sample from the brassiere had the same type as Ledet, that Ledet could have contributed to the blood on the white tennis shoe, that Hebert could not have contributed the DNA found on the three stains on the sweatshirt, and that Ledet could have contributed the DNA on the three stains from the sweatshirt. Smrz determined that on the matching shoe, Q48, there was DNA from more than one person, and that she could not exclude Hebert or Ledet as being contributors to the DNA on that stain. The major type in the mixture was the same type as Hebert. Smrz testified that the probability of selecting an unrelated individual at random from the population having the same polymarker, DQA1 and amelogenin and typing results as found in the stain from the bra was one in 940,000 in the black population, one in 2.3 billion in the Caucasian population, one in 260 million in the southeastern Hispanic population, and one in 14 million in the southwestern Hispanic population. Smrz stated that she could not say that the DNA on the bra was that of defendant.
Julie Golden, a forensic scientist at ReliaGene Technologies in New Orleans, was qualified as an expert in the field of forensic DNA analysis. She testified for the State that she performed a PCR DNA test on a blood sample from Michael Roussell and determined that his sample could not have been present on the bra, Q33; the shoes, Q43; or the sweatshirt, Q51.
As part of his investigation, Giroir interviewed James Fondren whose business was located around the 500 block of Ocean Avenue. At the trial of this matter, Fondren testified that in 1994 he owned Hi Tech Transmissions at 508 Ocean Avenue. He stated that he knew Ledet and had gone to school with him. Fondren said that he remembered a murder which occurred on Ocean Avenue right next door to his business. Fondren said that the day after the murder, Ledet came to see him and told him that the police would be by to ask him some questions. Ledet asked Fondren to tell the police that he worked for him. Fondren stated that Ledet did not work for him and, therefore, that Ledet was asking him to lie. Fondren admitted that Ledet used to do odd jobs for him, but that he hadn't done any odd jobs for some time before the murder.
As part of the defense case, Sergeant Neal Giroir and Officer Dwayne Munch were recalled to testify. Sergeant Giroir testified that he investigated Michael Roussell who was identified as the perpetrator of an aggravated burglary of Hebert's residence which occurred on July 4, 1993. When Giroir spoke to Roussell, Roussell became extremely emotional and could not continue the interview. Giroir requested that Roussell submit to a psychological *169 examination, but he never did. Roussell was never arrested for that burglary. Officer Dwayne Munch testified that he did not see any foam from mattresses or pillows at Hebert's residence, and that he never entered Ledet's residence. The defense also called Michael Roussell who stated that he remembered being accused of an aggravated burglary that happened at Hebert's house, that he did not become emotional during the interview, and that he was never arrested for or convicted of that aggravated burglary. Roussell also stated that he did not remember where he was on the night of March 22, 1994.
Janice Bell, Ledet's sister, testified for the defense that Ledet was living with their mother, Julia Ledet, at the time Hebert was killed. She stated that two years earlier, her mother had a stroke and had become forgetful. Bell stated that she remembered that Ledet had cut himself while repairing her screen door, but that she didn't remember when that had occurred.

ANALYSIS
In his first allegation of error, the defendant argues that the verdict is contrary to the law and the evidence. In his second allegation of error, the defendant argues that the trial court erred in the denial of the motion for new trial.
Defendant first argues that the evidence was legally insufficient to convict him. Specifically, he claims that: (1) a search of defendant's residence by police failed to reveal any shoes to match the shoe prints found at the scene; (2) no fingerprints were recovered from the scene; (3) no witness made a positive identification of defendant as the perpetrator of this offense; (4) the State's DNA expert, Agent Smrz, did not perform the serology testing which she referred to on direct examination; (5) significant error existed within the DNA testing process; (6) Agent Smrz admitted she was remiss in failing to perform DNA testing on a black sweatshirt; (7) additional error was noted in the transcription of the test results; (8) defendant's blood analysis by the FBI failed to reveal a PGM result similar to that found on the brassiere; (9) the property allegedly taken from the victim was never recovered from defendant or his residence; (10) there was no direct evidence, only circumstantial, that defendant committed the crime; and (11) there was no testimonial evidence which placed defendant at the scene of the crime.
The standard for reviewing the sufficiency of evidence was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and adopted by Louisiana in State v. Abercrombie, 375 So.2d 1170, 1177-1178 (La.1979), cert. denied, Abercrombie v. Louisiana, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). In Jackson, the court held that due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S.Ct. 2781.
Defendant was convicted of first degree murder, a violation of La.-R.S. 14:30, which provides in pertinent part:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... aggravated burglary ...
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is ... sixty-five years of age or older.
*170 Encompassed in proving the elements of the offense is the necessity of proving the identity of the defendant as the perpetrator. State v. Newman, 99-841 (La.App. 5 Cir. 12/15/99), 750 So.2d 252, 258 and the cases cited therein. When the key issue in the case is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. Id.
In a case involving circumstantial evidence, La. R.S. 15:438 provides that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Captville, 448 So.2d 676, 678 (La.1984); State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
At trial, the State presented the testimony of Dr. Susan Garcia, an expert in forensic pathology, who performed the autopsy on Hebert. She stated that Hebert had sustained multiple instances of blunt trauma, primarily to her head, face, neck, upper chest and back. Hebert had wounds on her right hand, forearm and right lower leg, indicating that they were more likely than not defensive wounds. Dr. Garcia stated that Hebert had multiple bruises and abrasions on her face, neck, clavicles, upper back and right buttock. Hebert sustained numerous fractured ribs, and had extensive bleeding into the right side and upper portion of her neck. She testified that the tissue swelled so much above Hebert's vocal cords that she couldn't breathe; therefore, she essentially asphyxiated, or died from lack of oxygen. Dr. Garcia opined that Hebert died sometime on March 22 or the very early hours of March 23.
Sergeant Neal Giroir testified that he investigated the Hebert homicide at 482 Ocean Avenue in Gretna. The investigation led Giroir to a suspect, Ledet, who lived at 437 Ocean Avenue. Giroir noticed that Ledet had a fresh injury on one of his hands. Giroir requested and obtained shoes and clothing from Ledet. Officer Dwayne Munch, the crime scene technician, testified that he took photographs and collected evidence from the scene. Much of the evidence was shipped to the FBI laboratory in Washington, D.C. for DNA testing.
Richard Buechele, an examiner in the materials analysis unit at the FBI laboratory in Washington, D.C., testified that he examined foam represented to him as having originated from a sheet at the victim's residence and foam removed from the suspect's clothing. Both foams could have come from a common source.
Melissa Smrz, an expert in forensic serology and DNA analysis and a supervisory special agent with the FBI in Washington, D.C., testified that she conducted polymerase chain reaction (PCR) DNA testing on numerous pieces of evidence in this case. She could not exclude Hebert or Ledet as being contributors to the DNA. The probability of selecting an unrelated individual at random from the population having the same polymarker, DQA1 and amelogenin and typing results as found in the stain from the bra was one in 940,000 in the black population, one in 2.3 billion in the Caucasian population, one in 260 million in the southeastern Hispanic population, and one in 14 million in the southwestern Hispanic population.
*171 Julie Golden, a forensic scientist at ReliaGene Technologies in New Orleans, testified that she performed a PCR DNA test on a blood sample from a previous suspect in the case, Michael Shorty, and determined that his sample could not have been present on the evidence collected.
Defendant argues that the DNA tests failed to reveal a PGM result similar to that found on the brassiere and, therefore, the serology result exculpates defendant. The State's DNA analysis expert, Smrz, testified that when the victim's brassiere was tested, a blood type of PGM 1-plus, 2-minus was found. While Smrz said that she didn't know what PGM type Ledet's blood contained because the results of the tests were inconclusive, she did not state, as contended by defendant, that the PGM results for Ledet's blood did not match the PGM results from the brassiere.
Defendant also contends that the DNA evidence was insufficient to convict him because significant error existed within the DNA process. Agent Smrz admitted that she failed to perform DNA testing on a black sweatshirt; and additional error was noted in the transcription of the test results. Smrz testified that the serology notes indicated that there were stains present on Q49, a black sweatshirt. Smrz admitted that she didn't test Q49 because she didn't see the stains until much later. Smrz also testified that she wrote results on her report next to specimens, but then realized they were incorrect, so she scratched through those results and entered the correct results next to the specimen numbers. She stated that she made personal notes next to some of the specimens and then crossed them out at a later date. Contrary to defendant's assertions, these admissions do not rise to the level of "significant" error.
Defendant argues that Smrz did not perform the serology testing which she referred to on direct examination. Smrz was qualified as an expert in forensic serology and DNA analysis; however, her testimony was based on her DNA analysis of the evidence. She only referred to the serology testing report when she was comparing her results to the blood types of the victim and the defendant. In addition, the defendant was afforded the opportunity to cross-examine the witness and point out this alleged deficiency to the jury.
Defendant claims that the State failed to prove he was the perpetrator of this crime. Thus, the identity of the perpetrator was at issue. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Newman, 750 So.2d at 258.
After hearing the testimony and evaluating the credibility of the witnesses, the jury chose to believe the State's witnesses. The question of the credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. The credibility of the witnesses will not be re-weighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
The evidence at trial showed that there was no reasonable explanation for the defendant's blood to be on the victim's brassiere other than that he was in the house beating her to death. There was no testimony at trial that defendant had ever been inside the victim's house before the homicide. The jury apparently rejected defendant's claim that the cut on his hand resulted from his replacing the screen door and concluded that the cut resulted from the attack on the victim. There was no evidence produced at trial to show that *172 the bra, the shoe, or any of the other evidence had been contaminated. The State offered evidence to show defendant attempted to have his former schoolmate, Fondren, lie for him to present an alibi. The jury, when presented with this evidence, could have reasonably found defendant was not a credible witness.
We find that the evidence presented in this case, considered in the light most favorable to the prosecution, is sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of first degree murder.
Defendant also alleges that the trial court erred in the denial of his motion for new trial. In his motion for new trial, he alleged that the verdict was contrary to the law and evidence on the same grounds as the allegations of error raised in this appeal. Because we find no reversible error, we also conclude that the trial court did not err in denying the motion for new trial.
In his third allegation of error, the defendant argues that it was error for the trial court to admit the DNA evidence at trial. Defendant challenges the trial court's pre-trial ruling that the DNA evidence was admissible, arguing that the evidence failed to meet the standard of reliability required by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, cert. denied, Quatrevingt v. La., 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996).
The general rule for admissibility of expert testimony is set out in LSA-C.E. art. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The decision whether to reject or accept the person as an expert falls to the great discretion of the trial court, whose rulings will not be disturbed absent an abuse of that discretion. State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, 870, cert. denied, Craig v. La., 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997).
In State v. Foret, 628 So.2d 1116, 1121-1131 (La.1993), the Louisiana Supreme Court examined and adopted the United States Supreme Court's established standard for the admission of scientific evidence in Daubert, supra. In Daubert, the Supreme Court held that Federal Rules of Evidence 702, rather than the "general acceptance" standard established by Frye v. United States, 54 App. D.C. 46, 293 F. 1013 (D.C.Cir.1923), controls the admissibility of expert scientific evidence in federal court. Under this standard, the trial court is required to act in a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." Id.
Scientific evidence should be admitted whenever the court's balance of the probative value and the prejudicial effect results in a determination that the evidence is reliable and helpful to the triers of fact. Admission of the scientific evidence is within the discretion of the trial judge. Quatrevingt, 670 So.2d at 204.
With regard to the relevance of DNA testing, LSA-R.S. 15:441.1 provides:
Evidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in *173 conformity with the Louisiana Code of Evidence.
It is clear from this provision that the Louisiana legislature intended DNA evidence to be admissible absent a showing that the evidence is unreliable. Thus, the first part of the Daubert/Foret analysis, the question of relevancy is satisfied. Louisiana courts have recognized that DNA typing is sufficiently scientifically reliable to cross the admissibility threshold. In addition, both Federal and other State courts have found that, in general, DNA profiling is a reliable technique and is admissible. Quatrevingt, 670 So.2d at 204.
The reliability of scientific evidence is to be ensured by a requirement that there be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of a "preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts at issue." Foret, 628 So.2d at 1122, citing Daubert, supra. In considering whether scientific evidence is reliable, the trial court should consider the following factors suggested in Daubert:
(1) The "testability" of the expert's theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
Daubert, 509 U.S. 579, 113 S.Ct. at 2796-97.
In this case, Smrz stated that she used the PCR base type tests to analyze the DNA found. PCR DNA analysis has been found reliable and admissible under the standards set out in Daubert. In State v. Edwards, 97-1797 (La.07/02/99), 750 So.2d 893, 910, cert. denied, Edwards v. Louisiana, 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999), the court said:
At least two federal circuit courts have found PCR analysis reliable and admissible under the standards set out in Daubert. See, e.g., U.S. v. Beasley, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. denied sub nom. Beasley v. U.S., 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997) (which listed, at 1147, n. 4, fifteen state appellate courts admitting DNA evidence derived from the PCR methodology); United States v. Hicks, 103 F.3d 837, 845-46 (9th Cir. 1996), cert. denied sub nom., Hicks v. U.S., 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997). A Louisiana court of appeal has also found reliable DNA evidence based on PCR methodology. State v. Spencer, CR95-208, CR95-328 (La.App. 3 Cir. 10/4/95), 663 So.2d 271.
In the instant case, defendant challenges the trial court's pre-trial ruling that the DNA evidence was admissible, arguing that the evidence failed to meet the standard of reliability required by Daubert and Quatrevingt. He further states that the trial court failed to fully consider all of the Daubert factors prior to admission of the evidence. A review of the testimony adduced at the pre-trial hearing provides strong support for the trial judge's decision to admit the DNA test results.
Melissa A. Smrz, who was accepted as an expert in forensic serology and DNA analysis, testified extensively regarding her credentials, the credentials of the testing facility and the strict controls used to insure the accuracy of her work. She stated that she obtained a bachelor of science degree in zoology and a medical technology *174 certificate from the University of Iowa and a master of science degree in criminalistic, which was also known as forensic science, from the University of Illinois, received credit in graduate level courses, and had special training in PCR DNA analysis. Smrz testified that she was employed as a supervisory special agent with the FBI in Washington, D.C. and was currently assigned to the DNA analysis unit of the FBI laboratory where she had been since 1992. Prior to entering the FBI, Smrz was a forensic serologist and hair examiner with the State of Virginia from 1986 to 1989. Hence, the trial court had a factual basis for concluding that Smrz was qualified by reason of education, skill, knowledge, and experience. The defense failed to undermine the State's showing despite its lengthy cross-examination of Smrz. Therefore, it does not appear that the trial court abused its discretion in accepting Melissa Smrz as an expert in the fields of forensic serology and DNA analysis.
Defendant also argues that the trial court did not fully consider the Daubert factors prior to the admission of the DNA evidence. However, Smrz testified that PCR DNA testing and the markers used in this case were generally accepted in the scientific community, that PCR had been in use since 1986, and that PCR was used in genetics laboratories, in paternity testing, and in the forensic community. This testimony satisfied the Daubert factor regarding general acceptance of the methodology in the scientific community. Smrz stated that the procedures and forensic theories used in the testing in this case had been subject to peer review and publication, which satisfied the peer review Daubert factor.
Testability, another Daubert and Quatrevingt factor, is satisfied if the methodology can be replicated. Edwards, supra. In the instant case, because the PCR methodology followed a step-by-step procedure, repeat testing was possible, and the results were verifiable, given sufficient sample size, by comparison with results obtained by use of another DNA analysis model, notably, RFLP, it appears that the testability factor was satisfied.
The final factor, the known or potential rate of error, was not specifically addressed by Smrz. However, the probability of error appears to have been low, and the factor satisfied, because the procedural methodology was well-defined and standardized to avoid arbitrary results or contamination of samples, and several experimental controls were used. Edwards, supra. Therefore, based on the foregoing, it does not appear that the trial court in the instant case abused its discretion in admitting the DNA test results.
The defendant next alleges that the trial court erred in the denial of his motions for mistrial. In his fourth allegation of error, he alleges that the prosecutor made impermissible references to "other crimes" evidence during the direct examination of State witness Officer William Cambre. In his fifth allegation, he alleges that the State made impermissible comments during its closing rebuttal argument.
During trial, Officer Cambre testified that he needed to find the defendant, "who was in the Jefferson Parish Correctional Center (JPCC), ..." Defense counsel immediately objected and, at the bench conference, moved for a mistrial. The trial court denied counsel's request. The trial court stated that, upon hearing the testimony, he assumed that defendant was incarcerated as a result of arrest for the instant crime, and not for another crime.
LA.-C.Cr.P. art. 770 provides in pertinent part:

*175 Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense;
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.
The trial court is mandated to grant a mistrial, upon motion of the defendant, when a remark or comment about another inadmissible crime committed by the defendant is made by the judge, district attorney, or a court official.
A police officer is not a court official under the mandatory mistrial provisions of La.C.Cr.P. art. 770. State v. Jackson, 00-191 (La.App. 5 Cir. 7/25/00), 767 So.2d 833, and cases cited therein. Thus, the defendant's request for a mistrial is governed by La.C.Cr.P. art. 771, which reads as follows:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such nature that it might create prejudice against the defendant, or the state, in the mind of the jury;
When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it satisfied that an admonition is not sufficient to assure the defendant a fair trial.
The decision to grant or deny a mistrial is within the sound discretion of the trial court. The denial of a motion for a mistrial will not be reversed on appeal unless the court has abused its discretion. State v. Ratcliff, 98-101 (La.App. 5 Cir. 2/23/99), 731 So.2d 356, 363, writ denied, 99-1112 (La.9/3/99), 747 So.2d 541. Mistrial is a drastic remedy and is warranted only where remarks result in substantial prejudice sufficient to deprive defendant of a fair trial. State v. Overton, 618 So.2d 439, 441 (La.App. 5 Cir.1993). A determination of whether prejudice has resulted lies within the sound discretion of the trial judge. State v. Smith, 430 So.2d 31, 44 (La.1983). Unsolicited and unresponsive testimony is not chargeable against the State to provide a ground for the reversal of a conviction. A witness's voluntary, unresponsive testimony which implicates a defendant in other crimes does not require a mistrial, at least where the form of the prosecutor's question does not indicate bad faith. State v. Jackson, supra.
In the instant case, Officer Cambre is not a "court official" under the provisions of La.C.Cr.P. art. 770 and, therefore, the provisions of La.C.Cr.P. art. 770 do not apply. The authority for a mistrial in this situation is found in La.C.Cr.P. art. 771.
*176 Based on a review of the record, we find that Officer Cambre did not refer to "other crimes" evidence allegedly committed by defendant when he said that he needed to locate Ledet who was in the JPCC. One could easily have assumed, as the trial judge did, that Ledet was in the JPCC as a result of being arrested for the crime in this case and not for any other crimes he may have committed. Further, Officer Cambre's comment was unresponsive to the question, and the complained-of testimony was vague and made no specific mention of the other crimes committed by defendant. Accordingly, the trial court did not err in finding that La.C.Cr.P. art. 771 does not warrant a mistrial in this case.
In his fifth allegation of error, the defendant argues that his motion for mistrial should have been granted because the prosecutor made impermissible comments in his rebuttal argument. In rebuttal, the prosecutor argued that if the defendant "thought that this lab was so incompetent as he testified to up here in closing argument, blaming everybody under the sun, blaming God for bringing rain when we want to go party; I tell you what, he could have hired a lab to test all of this to stand in front of you with a report and say,...." The defense counsel objected, which objection was denied by the trial judge. The State then continued:
That's right, ladies and gentlemen, he could have hired his own lab, his own lab. If he thought that these tests were so outrageous and so wrong; do you know that? His own lab. Like ReliaGene is just in Harahan, isn't it? If he thought that those results would come back in favor of his client; did you know that? Think about that, because these tests, there was nothing wrong with these tests.
La.C.Cr.P. art. 774 provides the scope of closing argument as follows:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
In the instant case, defense counsel in closing argument suggested various factual scenarios reflecting the defendant's innocence. Defense counsel suggested that the results of the DNA tests were wrong because the evidence was contaminated and the lab made mistakes. The defendant failed to produce any witnesses to substantiate his alternative scenarios of defendant's innocence. The prosecutor stated that the defense could have hired its own lab to conduct tests to substantiate his allegations of error. The prosecutor was simply responding to arguments made by the defense counsel in closing arguments, and was merely asking the jury to compare the State's evidence with the defendant's lack of evidence, which is permissible under LA.-C.Cr.P. art. 774. State v. Slay, 573 So.2d 1185 (La.App. 5 Cir.1991), writ denied, 92-3240 (La.4/7/94), 635 So.2d 1130. Therefore, we find that the reference made in this case by the prosecutor did not constitute a comment on defendant's failure to testify such that a mistrial was warranted.
In his sixth allegation of error, the defendant alleges that the trial court erred in the denial of the various challenges for cause issued by him during the voir dire.
An accused has the constitutional right to challenge jurors peremptorily, with the number of challenges fixed by law. La. Const. Art. I, § 17. La. *177 C.Cr.P. art. 799 provides the defendant in a death penalty case with twelve peremptory challenges. When a defendant uses all of his peremptory challenges, a trial court's erroneous ruling depriving defendant of a peremptory challenge constitutes a substantial violation of constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278. To prove there has been error warranting a reversal of the conviction and sentence, the defendant need only show: (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Robertson, supra. In the instant case, the record shows that the defendant used all twelve of his peremptory challenges.
The reasons a juror may be challenged for cause are set forth in La.C.Cr.P. art. 797 which provides, in pertinent part:
The state or the defendant may challenge a juror for cause on the ground that:
. . .
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
. . .
(4) The juror will not accept the law given to him by the court.
In State v. Anderson, 99-456 (La. App. 5 Cir. 10/26/99), 750 So.2d 1008, 1013, this court said:
A challenge for cause should be granted, even when a prospective juror declares his or her ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713; State v. Bailey, 97-302 (La. App. 5 Cir. 4/28/98), 713 So.2d 588, writ denied, 98 1458 (La.10/30/98), 723 So.2d 971. The trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror, and such a determination will not be disturbed on appeal unless a review of the voir dire as a whole indicates an abuse of that discretion. State v. Lee, 93-2810 (La.5/23/94), 637 So.2d 102; State v. Alberto, 95-540 (La.App. 5 Cir. 11/28/95), 665 So.2d 614, writ denied, 95-1677 (La.3/22/96), 669 So.2d 1222, writ denied, 96-0041 (La.3/29/96), 670 So.2d 1237.
Defendant argues that the trial court erred in refusing his challenges for cause of prospective jurors, Adams, Pitre, Everard, Batson, McCarthy, Grayson, (Donald) Michael, Dubois and Murphy, because of their inability to consider a life imprisonment sentence.
The proper standard for determining when a prospective juror may be excluded for cause because of views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), citing Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
La.C.Cr.P. art. 798(2)(a)(b) incorporates the standard of Witherspoon, as clarified by Witt, supra, and provides:
(2) The juror tendered in a capital case who has conscientious scruples *178 against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath[.]
The opposite is also true. In a "reverse-Witherspoon" context, the basis of the exclusion is that the potential juror "will not consider a life sentence and that... will automatically vote for the death penalty under the factual circumstances of the case before him[.]" State v. Robertson, supra at 1284. Furthermore, if a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
In reverse-Witherspoon cases, a prospective juror's knowledge of the particular aggravating circumstances in the case generally does not affect the juror's impartiality. State v. Miller, 99-0192 (La.9/6/00) 776 So.2d 396. However, in Robertson, at p. 1284, the court noted that "It is irrelevant that the potential juror can conceive of different factual situations where he might consider voting for a life sentence where his unwillingness to consider such a sentence in the case before him is clear." At page 1284. We note that the Louisiana Supreme Court has reversed several death penalty cases in which reverse-Witherspoon challenges by the defense have been denied, but the answers to questions on the particular aggravating circumstances required disqualification of the juror. See, State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320 (premeditated murder); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526 (rape and murder); State v. Robertson, supra, (double murder); State v. Ross, supra; State v. Miller, 776 So.2d at 404.
In this matter, the defendant attempted to challenge nine potential jurors, arguing that they would not consider life imprisonment. The record reflects that two of those jurors, Pitre and Everard, were peremptorily challenged by the State. Accordingly, defendant's rights were not violated by the court's refusal to grant defendant's challenge for cause against these two jurors.
With regards to jurors Adams, Batson, McCarthy and Dubois, the trial court found that each juror initially wavered back and forth in his/her consideration of whether they would impose a life sentence or the death penalty, and that each stated that they could consider the mitigating factors in determining the appropriate sentence. Prospective jurors Grayson, (Donald) Michael and Murphy stated during voir dire that, although they would be inclined to impose the death penalty, each was capable of considering arguments and mitigating circumstances, and could consider both life imprisonment and the death penalty.
A trial judge's refusal to excuse a prospective juror for cause is not an abuse of discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, where the juror has subsequently demonstrated a willingness and ability to decide the case impartially according to the law and evidence. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. In addition, a prospective juror who indicates his or her personal preference for the death penalty need not be stricken for cause. State v. Lucky, 96-1687 (La.4/13/99), 755 So.2d 845. We see *179 no abuse of discretion in the trial court's decision denying defendant's challenges for cause of these jurors.
Defendant argues that the trial court erred in refusing his challenges for cause of prospective jurors Adams, Pitre and Abadie, because of their inability to follow the law regarding the defendant's Fifth Amendment Right not to testify.
Pitre was peremptorily challenged by the State, and therefore, defendant's rights were not violated by the court's refusal to grant his challenge for cause against this juror.
The trial court found that, although both Adams and Abadie, expressed indecision about a defendant's failure to testify, they both stated that they would accept the law as given to them. We see no manifest error in this determination.
Defendant further argues that the trial court erred in refusing his challenges of prospective jurors Geary and Abadie on the grounds that they were not impartial. He also alleges that the trial court erred in refusing his challenge for cause of prospective juror Terrebonne, because he made "faces" during the questioning.
The defendant challenged Abadie based on his responses that he could not assure the court that he could be impartial because of his employment as a police officer. The defense counsel asked Abadie if his position as a police officer would influence his decision, and Abadie replied that he hoped not, but he couldn't say yes or no. The trial court denied defendant's peremptory challenge, stating that "I don't think nobody can ever assure you of things until they get called down to it." We see no abuse of discretion in the trial judge's ruling.
The record reflects that the trial court granted defendant's peremptory challenge of Geary, thus there is nothing in this decision for us to review.
We also see no abuse of discretion in the trial court's refusal to grant a peremptory challenge to exclude juror Terrebonne. The defendant sought to exclude him on the basis that he made "faces." The trial court apparently did not believe that these "faces" rendered Terrebonne unable to be an impartial juror.
Defendant's final argument is that the State violated his right to a fair trial by using its peremptory challenges to systematically eliminate African-Americans from his jury (Batson challenge). Both the defendant and the victim in this case were black.
Equal protection guarantees that criminal defendants have the right to be tried by a jury selected by nondiscriminatory criteria. U.S.C.A. Const. Amend. 14. It is well established that the use of peremptory challenges based solely on a juror's race is prohibited.
To prevail on a Batson claim that a prosecutor has used peremptory challenges in a manner violative of the Equal Protection Clause, a defendant must first make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of a juror's cognizable racial background. In determining whether the defendant has established a prima facie case of discrimination, the trial judge should consider all relevant circumstances, including any pattern of strikes by the prosecutor against minority jurors, and any questions or statements by the prosecutor during voir dire examination or in the exercise of his challenges which may support or refute an inference of purposeful discrimination.
If a prima facie case is established, the burden shifts to the prosecutor to *180 articulate a race neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. The Batson criteria are codified in LSA-C.Cr.P. art. 795. (Citations omitted).
State v. Jones, 00-162 (La.App. 5 Cir. 7/25/00), 767 So.2d 862, 866.
Furthermore,
A trial judge's determination pertaining to purposeful discrimination rests largely on credibility evaluations, so his findings are entitled to great deference by the reviewing court. The trial judge, advantaged by observing the characteristics and demeanor of the attorneys and prospective jurors, occupies the best position for deciding whether a discriminatory objective underlies peremptory challenges. This court has held that a trial court's rulings regarding discriminatory jury selection are entitled to great deference and will not be overturned absent a finding of manifest error. (Citations omitted).
State v. Touissant, 98-1214 (La.App. 5 Cir. 5/19/99), 734 So.2d 961, 964, writ denied, 99-1789, (La.11/24/99), 750 So.2d 980.
Defendant argues that the State systematically eliminated African Americans from the jury by using its peremptory challenges to exclude potential jurors Killebrew and Stevens. Defendant's contention is not supported by the record.
In the first jury panel, the State excluded Killebrew, at which time defendant lodged an objection. The court noted that there was no showing of systematic exclusion, as there were only two African-American members on the panel, and the State accepted the other member. In the fourth panel, the State challenged Stevens, one of the two African American members, on the grounds that she was a religion teacher, and might have some problems imposing the death penalty.
Based on the record before us, we find no error in the trial court's determination that no Batson violation occurred.
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors patent in this case.
For the above discussed reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).