815 So.2d 14 (2002)
STATE of Louisiana
v.
Kendall STEWART.
No. 2000-K-2960.
Supreme Court of Louisiana.
March 15, 2002.
Rehearing Denied May 24, 2002.
Richard P. Ieyoub, Attorney General, Walter P. Reed, District Attorney, Dorothy A. Pendergast, Counsel for Applicant.
Robert S. Glass, John W. Reed, New Orleans, Counsel for Respondent.
PER CURIAM.
Although it acknowledged that claims of ineffective assistance of counsel are generally reserved for post-conviction proceedings in which the petitioner bears the burden of overcoming "`the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,'" State v. Stewart, 99-2384, p. 3 (La.App. 1st Cir.9/22/00), 771 So.2d 322 (unpub'd)(quoting Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)), the court of appeal overturned respondent's conviction and sentence for distribution of cocaine in violation of La. R.S. 40:967(A) on grounds that the appellate record alone revealed that defense counsel had failed to prepare adequately for trial. *15 The First Circuit panel came to that conclusion in large part because counsel had not reviewed a videotape of the initial encounter between respondent and the undercover police agent involved in the sale of cocaine until after jury selection, and had failed to request a recess of several days to prepare a defense and respondent's testimony in light of the videotape's content. The court of appeal further found that "[g]iven that [respondent] asserted to [the undercover agent] on two occasions that he did not sell dope, and that neither the cocaine nor money passed through his hands, and the possible defenses available to him regarding his mental condition, a jury could have reasonably reached a different decision absent counsel's lack of preparation." Stewart, 99-2384 at 4. We granted the state's application to reverse the decision below because the court of appeal's decision fails to adhere to Strickland's admonition that "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding...." Instead, "[i]n every case, the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Strickland, 466 U.S. at 696-97, 104 S.Ct. at 2067-69.
It was undisputed at trial that on November 1, 1996, John Burkhalter brokered the delivery of a single rock of cocaine from the passenger seat of the Jeep Cherokee driven by respondent and occupied in the back seat by Jimmy Brewer, a reserve officer conducting an undercover narcotics operation for the police in Franklinton, Louisiana. The cocaine was transferred by the unidentified occupants of a red car, and Burkhalter paid for it with currency supplied by Brewer, who ordinarily worked out of an unmarked police car equipped with a video camera hidden in the front passenger side door to record each sale as it occurred. However, on this occasion, the video camera recorded not the sale of cocaine but a rambling and sometimes heated discussion between Brewer, who before the actual sale, sat at the wheel of the car to position himself within the view of the video camera's lens, and respondent and Burkhalter, who can be seen standing outside the driver's side of the car, with the Jeep Cherokee stopped behind them. After attempting to dispel rumors and to persuade respondent and Burkhalter that he was not "5-O," street slang for the police, the Agent Brewer left his own vehicle for a brief trip in the Jeep which culminated in the sale of the rock of cocaine to Burkhalter, who delivered it to Brewer. Respondent then drove the undercover agent back to his car and Brewer reported to his supervising officer, Detective Dan Manning. Brewer and respondent had known each other from junior high school, and on the basis of the information supplied by the undercover agent, Detective Manning secured and executed a warrant for respondent's arrest at the close of the undercover operation.
Respondent and his appointed attorney had first viewed the tape on the evening of September 30, 1998, during a two-day recess separating jury selection from the evidentiary portions of trial which began on October 2, 1998. On the morning trial resumed, respondent moved to discharge his attorney, arguing that counsel had failed to work with him in preparing a defense. Respondent complained that he had just viewed the video and needed more time to prepare a response to that evidence. Respondent also complained that apart from a meeting conducted by counsel in jail on July 30, 1998, when they went over the police report prepared by Detective *16 Manning and supplied by the state in open file discovery, counsel had ignored him. Defense counsel confirmed the meeting on July 30, which he characterized as an "extensive" discussion of the investigative reports, and acknowledged that because of his schedule he had otherwise not conferred with respondent. In fact, defense counsel conceded that while he had been aware of several requests by respondent to see him, and that he had intended to view the videotape over the summer, he had spent his time from mid-August preparing for a second-degree murder case with which he was "not at all familiar." A continuance of that trial had unexpectedly placed respondent's case on the court's trial calendar at the end of September. Despite the unanticipated turn of events, and his untimely review of the videotape, counsel assured the court that he found no surprises on the tape which, in his view, "comported largely with the facts as laid out in the reports, the investigative reports that we had and discussed at great lengths in July."
The trial court denied respondent's initial motion to discharge counsel and a later motion made by respondent to represent himself at the close of the state's case in chief after the prosecution played the videotape for the jury. Respondent then took the stand and denied that he was present at any transaction brokered by Burkhalter on Brewer's behalf. According to respondent, Brewer may have asked him about drugs and he may have replied that while he didn't sell drugs he "might know where some drugs [were] at," he never "did say I would take him to go get no drugs, and we never got any drugs." Instead, Brewer, an old acquaintance from junior high school, got in respondent's Jeep with Burkhalter for a ride through the neighborhood to a nearby liquor store, where respondent purchased a pack of cigarettes while his companions remained outside in the vehicle. "Whatever happened while I was in the store, I don't know what happened," respondent told jurors, "but if there was some drugs being sold maybe it happened while I was in the store, but to my knowledge I don't know if there was any sold." As for the interrogation of Brewer which preceded the trip to the liquor store, respondent attributed the concern about "5-0" to a self-described "organic mental syndrome" which made him prone to "overreact sometimes."
Represented by different counsel on appeal, respondent argued, and the First Circuit panel ultimately came to agree, that defense counsel's failure to exploit the exculpatory portions of the videotape in connection with a defense that he had been "merely present" at the drug transaction conducted entirely by Burkhalter, and counsel's failure to prepare him adequately to withstand the state's cross-examination of him based on the inculpatory portions of the videotape, constituted all of the prejudice he need show to support a claim that counsel had rendered ineffective assistance by failing to prepare adequately a viable defense under Louisiana law. See State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428 ("Only those persons who knowingly participate in the planning or execution of a crime are principals.... Mere presence at the scene is therefore not enough to `concern' an individual in the crime.")(citing State v. Schwander, 345 So.2d 1173, 1175 (La.1977)). Respondent further contends that counsel's inept approach to conducting the defense began with a generic voir dire examination of prospective jurors which made little effort to acquaint them with the law of principals under La.R.S. 14:24 and the differences between concerted action among individuals and mere presence at the scene of a crime committed by someone else, and no effort to hold the state to its burden of proof despite *17 anticipated testimony from respondent which would reveal his prior felony record. Defense of the case then ended with what respondent describes as a "pitiful" 25-line closing argument which made no attempt to advocate for respondent's acquittal but merely asked jurors to consider whether Brewer's testimony proved the state's case beyond a reasonable doubt.
We take a different view of the matter. The videotape forms part of the record on appeal and this Court has viewed the evidence for itself. In small measure, the video supports respondent's claims for its exculpatory portions. He appears visibly intoxicated but his slurred words do not obscure his disclaimers to Brewer in rapid succession that he did not sell drugs. However, in its entirety the video has an overwhelmingly inculpatory cast. The recorded conversation lasts several minutes. At times, it is not easily followed, because the three men often spoke at once and freely interlaced their conversation with obscenities in what defense counsel accurately characterized during his opening remarks to jurors as "trash talking ... dirty mouth street talk." Nevertheless, the video shows that both respondent and Burkhalter, standing elbow to elbow, repeatedly challenged Brewer to explain why, if he were not "5-O," he had been in the neighborhood making so many individual purchases of "20's," street slang for $20 rocks of cocaine. The tape indicates that under persistent questioning, Brewer struggled with his explanation that he was merely "fronting" for other purchasers who were unwilling to come into the neighborhood and unwilling to part with any more money than necessary to buy what they needed in the immediate moment. On this occasion, Brewer told his interrogators, a "punk ass" who was afraid to come to the "hill" had given him $20 for a "20," and to prove it, the agent pulled out a bill which Burkhalter then held up to the sunlight to make sure it was not counterfeit. Moments later, although the grainy quality of the video makes it difficult to reach a definitive conclusion, respondent appears to take the bill from Burkhalter as both men continued peppering Brewer with questions about his presence on the "hill" and the nature of his true intentions. The video shows that at one point, Burkhalter began questioning the agent about hidden cameras and reached into the car to flip down the sun visor in an attempt to find one. In the end, both respondent and Burkhalter indicated to Brewer they would make his connection for a "20" but insisted that he accompany them in their vehicle, not his, a proviso which the prosecutor interpreted for jurors during closing argument as a precautionary measure reflecting continuing uncertainty over Brewer's identity. "This was not," the prosecutor reminded jurors, "the first undercover operation in Franklinton."
Jurors viewed the videotape and could draw their own conclusions about the nature of the "trash talking" which accompanied the initial meeting of respondent and Brewer. See 4 J. Wigmore, Evidence, § 1157 (Chadborne rev. 1972) (discussing autoptic proference, or things proved by the self-perception of the tribunal). However, given the overall inculpatory cast of the tape, we cannot say on the present record that counsel's decision to emphasize other aspects of the case to shift the jury's attention away from what was, overall, a highly problematic piece of evidence for the defense did not reflect the exercise of reasonable professional judgment. In his opening statement to the jury, counsel acknowledged that jurors would see the video and hear the bad language but also stated that "the case is going to come down to whether you can believe beyond a reasonable doubt that Kendall Stewart knew everything that was going on. The testimony ... will be that Kendall Stewart never had his hands on any cocaine, that *18 John Burkhalter did all that." In fact, defense counsel was fully prepared to show more than just that. On cross-examination, Brewer testified that both respondent and Burkhalter "handled the money at one time or another." A close viewing of the video supports that testimony by the agent. However, under counsel's persistent questioning, the agent became uncertain and ultimately stated that video camera had caught only Burkhalter handling the departmental funds supplied by Brewer. After the state rested its case, defense counsel called Detective Manning as his own witness to establish that the police report prepared by the detective on the basis of information supplied by Brewer contemporaneously with the sale said nothing about respondent handling the money provided by Brewer. The detective further acknowledged that if Brewer "had said somebody other than Burkhalter, if he handed the money [to] somebody other than Burkhalter" and told him that, his report would have reflected the information.
Similarly, under cross-examination, Brewer insisted that he had provided his supervising officer with the make, model, and license plate number of the red car driven by the cocaine suppliers, even after counsel confronted him with Manning's police report which merely referred to a red car. Under further questioning by defense counsel, Detective Manning conceded that if Brewer had provided a more detailed description of the vehicle, that information, too, would have appeared in his report. Counsel had thereby called into question the reliability of Brewer's recall of the transaction and forced the state to concede in its closing remarks, even in the face of the demonstrative evidence buried in the grainy video, that Brewer "never said Kendall Stewart went out and got that cocaine and brought it to me. He never said Kendall Stewart went and got money."
Strickland imposes on a defendant the difficult burden of overcoming a strong presumption that the challenged action of his trial counsel reflected sound trial strategy because "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. In the present case, other counsel may have emphasized those portions of the videotape in which respondent interspersed his "dirty street talk" with denials that he dealt drugs, together with respondent's intoxicated condition and his tendency stemming from his self-described organic brain syndrome to overreact to suggestions that Brewer was "5-O." However, the existence of alternative approaches does not obscure the fact that counsel had reviewed the police investigative reports supplied by the state in open file discovery and ultimately did present a defense based on respondent's lack of knowledge or awareness of Burkhalter's intentions, in part by focusing his cross-examination of the state's witnesses on the evidentiary aspects of the case which tended to distance respondent, as much as he could be distanced, from Burkhalter's exchange of the money for cocaine. Counsel had a reasonable basis for concluding that respondent's statements to Brewer that he did not deal drugs did not form a significant part of that defense because the state had never claimed at any point in the case that respondent had conducted the hand-to-hand exchange with the occupants of the red car. Respondent's disclaimers to Brewer said little about his willingness to act as an intermediary in a sale made by someone else and therefore had little bearing on his culpability, or lack of it, in the present case. See State v. Celestine, 95 1393, p. 3 (La.1/26/96), 671 So.2d 896, 897 ("In Louisiana, an intermediary who arranges or facilitates the transfer of narcotics from the seller to the buyer may ... be charged *19 and punished as a principal in the act of distribution.").
With regard to the other components of respondent's ineffective assistance claim, we acknowledge the force of his argument that any reasonably competent and reasonably prepared counsel might have conducted an entirely different and far more effective examination of prospective jurors and then delivered far more than a perfunctory closing argument "amounting to little more than a mechanical submission of the defendant's fate to the decision-making process with no attempt to influence it...." State v. Myles, 389 So.2d 12, 31 (La.1979)(on reh'g); cf. State v. Messiah, 538 So.2d 175, 188 (La.1988)("Entirely satisfactory representation may include a brief closing argument intended to focus the jury's attention on a single item of strategy which counsel deems most likely to achieve a favorable verdict."). On the other hand, while respondent supposes that with more time to prepare counsel might have armed him better to withstand cross-examination by the prosecutor on the basis of the videotape, he does not suggest what easy answers there were to the prosecutor's closing argument, based on what the videotape said about respondent's knowledge and intent and what respondent could not explain adequately under cross-examination, i.e., that a casual meeting between junior high school acquaintances and a quick trip to the liquor store would not have begun with the long harangue about Brewer's true identity and the nature of his presence in the neighborhood.
At any rate, "[t]he object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which ... will often be so, that course should be followed." Strickland, 466 U.S. at 697, 104 S.Ct. 2052, 2069. We reject the conclusion of the court of appeal in the present case not because we disagree with its conclusion that, overall, counsel's performance grades out poorly. However, even assuming that other jurors might have found a reasonable doubt if the case had been tried as respondent now argues it should have been tried, respondent still falls short of what Strickland requires: a showing that the adversary process in the present case went so far wrong that no court may have confidence that it produced a reliable and just result.
The decision of the court of appeal is therefore reversed, respondent's conviction and sentence are reinstated, and this case is remanded to the district court for execution of sentence.
JUDGMENT OF THE COURT OF APPEAL REVERSED; CONVICTION AND SENTENCE REINSTATED; CASE REMANDED.
JOHNSON, J., dissents.