# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-21

STATE OF LOUISIANA

VERSUS

CORLIOUS C. DYSON

AKA CORLIOUS CORALL DYSON

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 140554
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

**********

**SHANNON J. GREMILLION
JUDGE**

**********

Court composed of Shannon J. Gremillion, John E. Conery, and David E. Chatelain, Judges.[1]

**CONVICTION AND SENTENCE AFFIRMED;
REMANDED WITH INSTRUCTIONS.**

---

[1] Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore

**Keith A. Stutes, District Attorney**
**Fifteenth Judicial District**
**Cynthia K. Simon, Assistant District Attorney**
**P. O. Box 3306**
**Lafayette, LA 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
       **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P.O.Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
       **Corlious C. Dyson**

**GREMILLION, Judge.**

In the early morning of August 26, 2012, the victim, Clement Amos, encountered Defendant, Corlious C. Dyson, standing outside a neighbor's door. When Mr. Amos questioned Defendant as to what he was doing, Defendant shot the victim five times. Mr. Amos died as a result of the gunshot wounds.

Defendant was indicted for the August 26, 2012 second degree murder of Clement Amos. A jury found Defendant guilty of second degree murder. Defendant filed a "Motion for a New Trial" and a "Post-Verdict Motion of Acquittal." Defendant also filed a "Motion to Allow Defendant to Proffer Testimony Excluded During Trial." The trial court denied the first two motions in open court. However, the trial court allowed Defendant to file the proffer into the record. The trial court sentenced Defendant to life imprisonment without the benefit of parole, probation, or suspension of sentence. Thereafter, Defendant filed a "Motion for Reconsideration of Sentence," which the trial court denied.

Defendant appeals and alleges the evidence was insufficient to establish that he was the man who shot and killed the victim, and the trial court erred when it denied his oral motion for a mistrial and his written motion for a new trial based on erroneous evidentiary rulings and improper intervention by the trial court into the case. For the following reasons, we find there is no merit to either of Defendant's allegations of error. Accordingly, we affirm Defendant's conviction and sentence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there is one error patent. Additionally, the court minutes of sentencing require correction.

First, the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

Next, the court minutes of sentencing do not reflect that the trial court imposed Defendant's life sentence at hard labor as indicated in the transcript. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is ordered to correct the sentencing minutes to reflect that Defendant's sentence is to be served at hard labor.

## SUFFICIENCY OF THE EVIDENCE

Defendant asserts that the evidence presented to the jury was insufficient to sustain the verdict of second degree murder. Specifically, Defendant argues that since there was no eyewitness to the actual shooting, the evidence that he was the shooter was circumstantial. Defendant notes that the witnesses who identified him from a photographic lineup did not identify him as the shooter in court. Finally, Defendant argues that the DNA testimony was inconclusive and misleading in that the DNA analysis did not identify him as one of the mixed, partial DNA profiles found on evidence from the scene of the crime.

2

In *State v. Fields,* 08-1223, pp. 6-7 (La.App. 4 Cir. 4/15/09), 10 So.3d 350, 354, *writ denied*, 09-1149 (La. 1/29/10), 25 So.3d 829, regarding the sufficiency of the evidence to identify the perpetrator, the fourth circuit stated:

> In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Ragas*, 98-0011, p. 13 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106. The *Jackson* standard applies to all evidence, both direct and circumstantial, to test whether it is sufficient to prove guilt beyond a reasonable doubt to a rational jury. *State v. Neal*, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 656, citing *State v. Captville*, 448 So.2d 676, 678 (La.1984). The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. *State v. Smith*, 600 So.2d 1319, 1324 (La.1992). Within the bounds of rationality, the trier of fact may accept or reject, in whole or in part, the testimony of any witness. *State v. Casey*, 99-0023, p. 14 (La.1/26/00), 775 So.2d 1022, 1034. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. *Id.,* citing *State v. Mussall,* 523 So.2d 1305 (La.1988).
>
> When a conviction is based upon circumstantial evidence, La. R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. This is not a separate test from *Jackson v. Virginia,* but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. *State v. Wright* 445 So.2d 1198, 1201 (La.1984).
>
> "When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt." *State v. Weber*, 02-0618, p. 11 (La.App. 4 Cir. 12/4/02), 834 So.2d 540, 549. *See also State v. Edwards*, 97-1797, pp. 12-14 (La.7/2/99), 750 So.2d 893, 902.

In the current case, Defendant was convicted of second degree murder, which is defined in pertinent part as "the killing of a human being: 1) When the offender has a specific intent to kill or inflict great bodily harm[.]" La. R.S. 14:30.1(A)(1). Specific intent is that state of mind which exists when the

3

circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Furthermore, the supreme court has established that positive identification by one witness only is sufficient to support a conviction. *State v. Weary*, 03-3067, (La. 4/24/06), 931 So.2d 297, *cert denied,* 549 U.S. 1062, 127 S.Ct. 682 (2006). It is the finder of fact who weighs the respective credibilities of the witnesses, and an appellate court will generally not second-guess those determinations. *State v. Bright*, 98-398, p. 22 (La. 4/11/00), 776 So.2d 1134.

At the trial, the following testimonies and evidence were submitted to the jury:

Kelly Amos, the victim's wife, testified that they lived at 129 Hummingbird Lane in Lafayette, Louisiana. On August 26, 2012, Ms. Amos testified that she, her husband, and their three children arrived home from visiting Mr. Amos's parents at about 1:15 a.m. They found Jayde Lange, Sandra Harris, Carlos Omos, and Calisa Desselle sitting outside Ms. Harris's two story, four-plex apartment building. The Amoses' apartment was in a building across the street. They were told about someone snooping around the apartment buildings. They exchanged phone numbers. The Amoses stayed outside for about twenty minutes then went to their apartment and went to bed. At about 4:00 a.m., Ms. Lange called Ms. Amos and said there was someone at her door. The Amoses went outside, but they could not see anyone at Ms. Lange's second-floor apartment door. Mr. Amos went across the street and started up the stairs as Ms. Lange came out her door. Pointing to Ms. Desselle's door, which was across the second-floor walkway, Ms. Lange cried, "Look, there he is." Mr. Amos asked the man, "Hey, can I help you with anything?" The man replied, "No." Ms. Lange then started screaming, "You had

4

been there for thirty minutes. I've seen you standing there." Ms. Amos stated that the man stepped out into the light and pointed a gun at her husband. She ran into the apartment to call the police and to get a gun that was in the apartment. While she was searching for the gun, she heard gunshots. She ran out of the house and found her husband lying on the ground. She testified she was not able to clearly see the man's face but said he was wearing a white tee shirt and red shorts.

Ms. Desselle lived at 126 Hummingbird Lane on the second-floor of the apartment building in Apartment D. She testified that at about 10:00 p.m. on August 25, 2012, she was standing in her living room when she heard someone open the screen door of her apartment. Not knowing who it might be, she did not go to the door. Shortly thereafter, she heard the door close and steps walking away from her apartment door and going down the stairs. Ms. Desselle testified that she looked out her window and saw a man wearing a white tee shirt and red shorts. After the man left, she saw neighbors, Ms. Harris and her boyfriend, Mr. Omos, standing outside. She went out and asked them if they knew the man, but they did not. Ms. Desselle stayed outside talking to her neighbors. She said she also saw Ms. Amos and the victim arrive at their apartment across the street. At about midnight, Ms. Desselle said that she went back to her apartment and went to bed. She stated that at about 4:00 a.m., she was awakened by gunshots. She went outside and saw Ms. Amos crying over the body of her husband at the bottom of the stairs.

Ms. Harris resided on the ground floor of the same apartment building as Ms. Desselle. Ms. Harris testified that on August 25, 2012, she and her boyfriend had gone outside that evening and were sitting in chairs below the second-floor walkway. She heard a screen door close upstairs and watched a man dressed in a

5

white tee shirt and red shorts walk down the stairs. She greeted him, and the man responded, "What's up?" She stated she got a good look at his face. Ms. Harris said that he was a black male, tall, medium build, with short hair and gold front teeth. Ms. Harris stated that afterwards she spoke with both her neighbors, Ms. Desselle and Ms. Lange, about the man. She said that Ms. Lange had already spoken with her about a man hanging around the neighborhood in the early morning. Ms. Harris testified that she, Mr. Omos, and Ms. Lange and her boyfriend, Craig George, made a quick perusal around the apartment building, then sat outside talking until about 3:00 a.m. During this time, Ms. Amos and the victim arrived. Ms. Harris testified she and Mr. Omos went to bed around 3:45 a.m. Shortly thereafter, they heard shots. When they went outside, the victim was lying on the ground at the bottom of the stairs.

On October 17, 2012, Ms. Harris identified Defendant from a photographic lineup. While Ms. Harris agreed that on the photographic lineup statement form, she wrote that the man she identified "looks the most like the person seen that day," she testified that the person she identified, number two of the photographic lineup of six, was the person she saw walking down the stairs the morning of August 25, 2012.

Ms. Lange testified that she lived at 126 Hummingbird Lane, Apartment C. She said that in the early morning of August 25, 2012, at approximately 4:00 a.m., she was sleeping in a recliner in her living room. Her boyfriend, Mr. George, and his two children were also sleeping in the apartment. She stated she was awakened by the squeak of her screen door being opened. She said she could tell someone was listening at the door. Then she heard a knock. Mr. George answered the door. Ms. Lange testified that she heard a man say that his car needed a boost. She said

6

that Mr. George dressed and left the apartment with the man. Later, she heard someone on the porch outside her apartment and called the police. Later in the day, Ms. Lange stated that she saw a car with two people sitting in it. She was suspicious of the vehicle so she noted the license plate number on her phone. After the shooting, she told the police she thought the passenger in the car was the shooter and gave them the license plate number.

Ms. Lange testified that on August 25, 2012, Ms. Harris knocked at her door and told her about seeing the strange man. Ms. Lange went outside and spoke with Ms. Harris, Mr. Omos, the Amoses, Ms. Desselle, and another neighbor about a person prowling around the apartments. They exchanged phone numbers and agreed to keep in touch. Ms. Lange stated that she stayed outside until approximately 2:30 to 3:00 a.m. talking with the neighbors and then went back into her apartment. She said that about 4:00 a.m., she heard someone walk up the stairs. She looked out her window and saw someone standing at Ms. Desselle's apartment door. Ms. Lange called Ms. Amos and told her the man was back on the porch. She also called the police again. Ms. Lange then saw the victim approach from across the street. The man was knocking on Ms. Desselle's door. Ms. Lange said that the victim walked up the stairs and asked the man if he could help him. The man said that his car needed a boost. Ms. Lange opened her door and told the victim that he was the same man who came to her door the evening before asking for a boost. She stated that the man asked who owned the gold car parked downstairs. She said she asked him "'[D]o you need a boost or you need the person that drives that car' and he was like 'who lives here?'" The man then pointed a gun at her. She ran inside her apartment and called the police. Within a minute, she heard several gunshots. She stated that the man who pointed the gun at

7

her wore clearish, white gloves. He was dark skinned, had gold teeth, wore a white tee shirt and red shorts, and was of medium build. On October 17, 2012, Ms. Lange identified Defendant as the shooter from a photographic lineup.

John Sullivan, a detective with the Lafayette Parish Sheriff's Office, led the investigation. He arrived on the scene at 5:08 a.m. He was first briefed by the witnesses. He was told by Ms. Harris that Ms. Lange had seen a vehicle, parked close to the apartment building, the morning before. Detective Sullivan was shown two plastic gloves that were located on the fourteenth and ninth steps leading down from the second floor of the apartment building. The gloves were collected as evidence. There was a similar plastic glove also collected as possible evidence found on a shrub a short distance away from the apartment. Detective Sullivan was given a description of the man seen on the building's second-floor walkway: slender black male, over six feet tall, dark complected, short hair, and gold front teeth.

Detective Sullivan testified that he followed up on Ms. Lange's observation that the shooter may have been in a vehicle she saw in the vicinity; he determined that the owner of the vehicle lived in Abbeville. The owner's daughter, who lived in Morse, had possession of the car. The daughter and her boyfriend, Cody Boudreaux, were picked up and interviewed in Lafayette. Detective Sullivan stated that he received search warrants for the vehicle and their residence. It was determined that on the morning of the shooting, she and Mr. Boudreaux were riding around Abbeville and returned home around 3:00 or 4:00 a.m. Shortly thereafter, a friend called and asked for a ride to work. A surveillance camera installed at the friend's employment showed the vehicle dropping the friend off around 5:00 a.m. However, on August 26, 2012, Detective Sullivan had a

photographic lineup prepared which included a picture of Mr. Boudreaux. Ms. Harris was shown the photographic lineup, but she did not identify any person in the lineup.

Detective Sullivan testified that various potential suspects were looked at but eliminated. Then in October 2012, Detective Sullivan received a call from Claire Guidry with the Acadiana Criminalistics Laboratory (ACL) who informed him that the DNA profiles obtained from the gloves found on the apartment building's steps were entered in the "CODIS" system and a "hit" indicated Defendant as a potential contributor. Based on this information, Detective Sullivan prepared a photographic lineup which included Defendant. The lineup was shown to both Ms. Harris and Ms. Lange. Both women identified Defendant as the shooter.

Dr. Christopher Tape, who worked for the Louisiana Forensic Center, performed the autopsy on the victim's body. He testified there were a total of five gunshot wounds to the victim's head and body. One gunshot entered the back top of the victim's head. The bullet from this wound was recovered from the victim's jaw. A second gunshot entered the victim's chin and exited the other side toward the back of the chin. A third gunshot entered the right, upper back. A fourth gunshot wound entered the right side of the victim's chest, and the fifth gunshot wound entered the upper right area of the victim's abdomen. Dr. Tape stated that the placement of the entry wounds indicated that either the gun was moving or the victim was moving, or both, at the time the shots were fired. Moreover, the gun was discharged from a distance of more than three feet from the victim.

Ms. Guidry was qualified as an expert in the field of forensic DNA analysis. She worked for ACL and conducted the analysis of the DNA found in the three gloves recovered at the crime scene. Ms. Guidry testified that the analysis of the

two gloves found on the apartment building's steps showed a mixed, partial DNA profile. She explained that there was more than one contributor to the DNA profile and only a partial DNA of each was revealed. The profiles from the three gloves were submitted to CODIS.[2] Of the gloves found on the ninth and the fourteenth steps, Ms. Guidry testified that CODIS made "hits" to Defendant. She explained that CODIS, a DNA data repository with the Federal Bureau of Investigations, contained a profile that had similarities or "association" with the two profiles ACL had submitted.

Ms. Guidry contacted the police with this information on October 15, 2012. She received a reference DNA sample from Defendant. After analyzing the reference sample, Ms. Guidry concluded that she could not make an identification. She testified, however, that she could not exclude Defendant as a contributor. She explained:

> [I]n calculations, we use a statistical program called "pop stats" which is created and developed by the FBI and uses a population database created by the FBI to generate statistics. With regards to item 1, approximately 99.999998% of the African Americans population would be excluded, or approximately one in fifty-nine million African Americans would be included as potential contributors. And what that means is that a random person - - a random unrelated person selected out of the population has a one in fifty-nine million chance of having their DNA profile not being excluded, or a 99.999998% of being excluded as a potential contributor. In addition, approximately 99.999994[%] of the Caucasian population would be excluded, or one - - approximately one in one hundred seventy-five million Caucasian would be included as potential contributors.

Ms. Guidry explained that when making a comparison between the evidence profile and the reference profile, she tests "the DNA at sixteen different locations which each individually is called a "locus" and collectively called "loci", which

---

[2]Combined DNA Index System.

10

one can think of in terms of a street address along a highway. A locus is a specific location on the DNA." Ms. Guidry went on to explain:

> [T]he individual had alleles in common. An allele is basically a variant form of a gene similar to cars on [ ] the lot of a dealership where you have the same make and model of a car parked next to each other – one painted red, one painted blue. It's the same car, but you have a red version and a blue version. Same thing with alleles. It's different versions of the same gene. So, when comparing a reference sample - - an evidence sample and a reference sample, I look for similarities and difference among the alleles that are called at each of those locations in the DNA, the sixteen locations. So, for Item 2, there were eleven location where Corlious Dyson was completely observed in the mixed DNA profile.

She further testified that for the other glove, item 1, there were fifteen locations where [Defendant's] alleles were completely observed in the mixture. However, Defendant was excluded from the mixed, partial DNA profile found in the glove located in the shrubbery.

Dr. Ronald Acton, a microbiologist and immunologist, who was also qualified as a forensic DNA expert, testified on behalf of Defendant. Generally, Dr. Acton agreed with Ms. Guidry that Defendant could not be excluded as a contributor to the mixed, partial DNA profile found in one of the gloves found on the steps. However, he did testify that in a case when there are other individuals contributing DNA, the genetic markers or alleles presented in the results should be categorized either as an exclusion or as inconclusive for the reason that other individuals' DNA could leave alleles, which when mixed with DNA profiles of other subjects could provide the same results. While Dr. Acton found nothing wrong with the testing protocol of ACL, he noted that highest position Ms. Guidry could achieve with her Master of Science degree in any of his former laboratories would be supervisor. He also noted that ACL's director did not hold a Ph.D, who generally would be required to sign off on any testing results. However, he did not

disagree with the results of ACL's testing which produced the profile of the mixed, partial DNA found in the two gloves or the results of the testing procedures which produced Defendant's DNA profile from the reference sample.

Defendant argues in brief that the lack of an eyewitness to the shooting and the DNA testimony, which did not positively identify Defendant as a contributor to the mixed, partial DNA profile, were circumstantial evidence at best and were insufficient to sustain the verdict of second degree murder.

While no one saw Defendant pull the trigger of the gun that killed the victim, Ms. Harris identified Defendant as the man she saw in the early evening of the shooting and Ms. Lange identified him as the man she saw just minutes before the shooting. Both witnesses identified Defendant from the photographic lineup as the man they saw then.

Factors to consider in assessing the reliability of an identification include: 1) the witness's opportunity to view the perpetrator at the time of the crime, 2) the witness's degree of attention, 3) the accuracy of his or her prior description of the criminal, 4) the level of certainty demonstrated at the confrontation, and 5) the time between the crime and the confrontation. *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243(1977). Ms. Desselle saw a man dressed the same as the man later identified as Defendant, in the late evening of August 25, 2012, as did Ms. Amos on the morning of August 26, 2012. Ms. Desselle stated that the man who stood at her door wore a white tee shirt and red shorts, and the man seen and described by Ms. Harris a minute later coming down the steps from the second-floor walkway on the evening of August 25, 2012, wore red shorts and a white tee shirt and had gold teeth. Ms. Harris testified she and Mr. Omos were sitting in chairs at the bottom of the steps. The steps ended right at her front door and her porch light was

on. Ms. Lange saw Defendant with a gun as he stood on the second-floor walkway just minutes before Mr. Amos was shot. She testified that her front door light was on when she observed Defendant. She spoke with Defendant before he raised the gun. She observed that he was wearing a plastic glove like the ones found on the steps immediately after the shooting. After she ran back into her apartment, she heard pounding on the stairs, like someone running down the steps, then gunshots. Ms. Lange further testified that the man who pointed a gun at her wore a white tee shirt and red shorts and described him as having short hair and gold teeth. Furthermore, while Ms. Lange did not see the man who knocked at her door in the early morning of August 25, 2012, whose excuse for being at her door was that his car needed a boost, the man in the white tee shirt and red shorts on the walkway on the morning of August 26, 2012, made the same statement to the victim.

On the photographic lineup form it was noted that Ms. Harris stated that Defendant "looks the most like the person seen that day." Defendant argues in brief that "[h]er testimony and statement written on the lineup form were not an identification of [Defendant] as the person she saw, rather she only indicated that [Defendant's] picture looked the most similar to the suspect, out of the six people in the lineup." When questioned about what the statement meant, Ms. Harris stated that it meant "[t]hat that's the person that I identified." Ms. Harris said that she did not guess when she made the identification because she was told not to guess by the detective.

Defendant also argues that the two witnesses never identified Defendant in open court as the man seen on the second-floor walkway. Defendant argues that in *State v. Ware*, 06-1703, pp. 7-9 (La. 6/29/07), 959 So.2d 459, 463-64, n.1, the supreme court stated that when identification of a defendant is an issue, the test to

13

negate misidentification presupposes that the defendant was identified at trial by the witnesses. In *Ware*, the supreme court noted that the witness did not give an in-court identification of the defendant as her assailant. However, she had testified that her former father-in-law was the assailant. The supreme court noted that the jury had the benefit of observing the witnesses and the defendant and could judge for themselves. The supreme court referred to *State v. Stewart*, 00-2960, p. 7 (La. 3/15/02), 815 So.2d 14, 17, which "cit[ed] 4 J. Wigmore, *Evidence,* § 1157 (Chadborne rev.1972) for the principle of autoptic preference, or things proved by the self-perception of the tribunal)." *Ware*, 959 So.2d at 463. We have not found any jurisprudence requiring an in-court identification of the defendant is a necessary element to negate an allegation of misidentification. In the current case, the jury had the benefit of seeing the photographic lineup which included Defendant's picture and Defendant sitting in the courtroom and observing Ms. Harris and Ms. Lange testify that they identified Defendant from his picture in the lineup.

In brief, Defendant points out that neither Ms. Harris nor Ms. Lange testified they saw that Defendant had tattoos, which "[Defendant] clearly had in the photo[s.]" Detective Sullivan admitted that of all the persons he interviewed who saw the shooter during that time period, none indicated they noticed tattoos. Despite Defendant's assertion that tattoos were clearly discernible in the photographic lineup, the lineup photograph does not clearly show tattoos on Defendant's face or neck. The jury had the benefit of sitting in the courtroom for several days with Defendant. They could see whether Defendant had tattoos that

could clearly distinguish him from someone with the same complexion but without tattoos.[3]

Finally, Defendant argues that concerning the DNA analysis:

The only absolute conclusion that can be reached in DNA analysis is that someone is "excluded" as a source, never that the person is "included." (R. at 367, 377, 380). Therefore, when a sample does not reveal the full DNA profile of a suspect, the evidence may not prove anything. (R. at 541). It is circumstantial at best.

We find that when considered in a light most favorable to the prosecution, the evidence sufficiently supported the verdict of second degree murder. Moreover, we find that the evidence presented negated the possibility of misidentification. The direct and circumstantial evidence put Defendant at the scene of the crime at the time the crime was committed. As noted above, a single eyewitness's testimony that a perpetrator was at the scene of the crime was sufficient to establish that he was there. While it was circumstantial that Defendant killed the victim, Defendant was seen with a gun in his hand a minute before the shots were fired. He was the only person standing at the top of the steps which led down to the ground floor. The victim was the only person on the steps a minute before the shots were fired. Also, as Defendant admits, the mixed, partial DNA located in the gloves left behind on the steps after the shooting that could not exclude Defendant from having contact with the gloves was circumstantial evidence. However, considering the direct evidence of his immediate presence and the circumstantial evidence tending to show that he was the one who pulled the trigger, it was reasonable that the jury concluded Defendant was the shooter. Furthermore, considering that Defendant shot the victim five times with a firearm,

_____

[3]We note that Defendant's picture used for the photographic lineup was blown up and included as defense exhibit number 8. The picture faintly shows tattoos on Defendant's neck.

it was reasonable for the jury to conclude beyond a reasonable doubt that Defendant had the specific intent to kill or inflict great bodily harm. The discharge of a firearm at close range aimed at a person indicates a specific intent to kill or inflict great bodily harm upon that person. *State v. Seals*, 95-305 (La. 11/25/96), 684 So.2d 368, *cert. denied*, 520 U.S. 1199, 117 S.Ct. 1558 (1997).

Lastly, Defendant briefly argues that he could not have been found guilty as a principal. Except for a brief speculation that the shooter was seen as a passenger in a vehicle later in the morning, there was no evidence or discussion in the record to indicate there was another involved in the killing of the victim.

There is no merit to this assignment of error.

### RIGHT TO PRESENT A DEFENSE

Defendant argues that the trial court made several erroneous evidentiary rulings which interfered with his right to present a defense. Specifically, he argues that the trial court impermissibly interjected itself into the trial by aggressively questioning a witness and the trial court would not allow defense counsel to question the credibility of Detective Sullivan's investigation. Finally, he asserts that the trial court did not fulfill its gatekeeping function "when it allowed the State's forensic DNA 'expert' to qualify as an expert."

First, Defendant argues that the trial court's questioning of Ms. Harris during the State's direct examination, "made Mr. Harris' answers, *thereafter in front of the jury*, become more clear and confident, when she had only moments beforehand stated she did not remember all the events clearly."

In *State v. Thomas*, 12-1458, pp. 3-5 (La.App. 3 Cir. 6/5/13), 114 So.3d 684, 687-88, this court discussed a trial court's questioning of witnesses during trial, as follows:

16

Article 772 of the Louisiana Code of Criminal Procedure, referred to as the "no-judge-comment rule," states: "The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted." See identical prohibition regarding jury charges in La.Code Crim.P. art. 806. The Century-old rule is that a "[j]udicial comment upon the facts or the evidence in the presence of the jury is a *noncorrectable error which must result in mistrial or reversal.* [La. Code] Cr.P. [art.] 772[; La.Code] Cr.P. [art.] 806." *State v. Brevelle*, 270 So.2d 852, 855 (La.1972) (citing *State v. Lonigan,* 263 La. 926, 269 So.2d 816 (1972); *State v. Iverson*, 136 La. 982, 68 So. 98 (1915); *State v. Langford*, 133 La. 120, 62 So. 597 (1913) (emphasis added)).

In *State v. Williams*, 375 So.2d 1379 (La.1979), where the trial court extensively questioned a witness, the Louisiana Supreme Court explained the no-judge-comment rule and reversed the conviction on the ground that the questioning constituted improper comments on the evidence:

> The no-judge-comment rule is designed to safeguard the role of the jury as the sole judge of the facts on the issue of guilt or innocence. *State v. Hodgeson*, 305 So.2d 421 (La.1974) and decisions there cited. Thus, if the effect of a question or comment is to permit a reasonable inference that it expresses or implies the judge's opinion as to the defendant's innocence or guilt, this constitutes a violation of the defendant's statutory right to no-comment and thus requires reversal. *State v. Green*, 231 La. 1058, 93 So.2d 657 (1957). Likewise, any comment or question by the judge expressing or implying his opinion with regard to a material issue is reversible. *State v. Hodgeson*, 305 So.2d 421, 421 (La.1974) (summarizing decisions).

> The no-comment rule does not bar a trial judge from asking clarifying questions in the presence of the jury; nevertheless, in the exercise of this power, the judges questioning must be cautiously guarded so as not to constitute an implied comment. *State v. Nicholas*, 359 So.2d 965 (La.1978). The judge may even question a witness as to a material matter which has been omitted, providing he does so in an impartial manner and conducts his examination in such a way that he does not indicate his opinion on the merits or any doubt as to the credibility of the witness. *State v. Groves*, 311 So.2d 230 (La.1975). See, generally, Joseph, Work of the Appellate

Courts in 1974-75 Criminal Trial Procedure, 36 La.L.Rev. 605, 624-26 (1976).

However (whatever its wisdom), the legislative imposition of the no-comment rule represents a considered determination that the trial judge's role is essentially as an impartial umpire in an adversary trial, rather than as an active participant in the development or presentation of evidence. Therefore, as we warned in *State v. Wagster*, 361 So.2d 849, 856 (La.1978):

" * * * (Q)uestioning of witnesses in a criminal jury trial by the judge is a practice to be avoided unless deemed indispensible to a fair and impartial trial. A judge should be constantly aware of the basic premise of a criminal trial which calls upon the State, not the judge, to prove the defendant's guilt beyond a reasonable doubt. It is enough for the judge to impartially and wisely regulate the conduct of the trial without participating in the interrogation of witnesses, a practice fraught with danger of prejudice to the defendant."

*State v. Williams*, 375 So.2d at 1381-82 (footnote omitted).

During the State's examination of Ms. Harris concerning the three photographic lineups summited to her by the police, the trial court interrupted the State's questioning, sent the jury out of the courtroom, and questioned Ms. Harris. Defendant argues:

The State asked Ms. Harris if she remembered being shown two lineups—State exhibits 7 and 14—to which Ms. Harris replied, "I don't recall." (R. at 449). She then said "No, I didn't identify some – anyone" in the lineups. *Id.* Nor did she recognize anyone in the lineups (R. at 450). Ms. Harris said she did not remember doing the lineup, but conceded the signature on the form looked like her signature. (R. at 499). The trial court then interrupted the prosecution, without either party asking it to do so[.]

Defendant then cites a portion of the trial court's questioning of the witness and argues:

The trial court then asked similar questions regarding Exhibit Number 7, but Ms. Harris indicated she did not initial a photo in that lineup. (R. at 451). Defendant counsel stated his confusion to the purpose of the questioning. (R. at 452). The trial court then replied, in front of Ms. Harris:

> COURT: Oh, I know where she was going. I know exactly where she was going and I know exactly what's going on with this witness. Okay? All right. Let's bring the jury back in.

Defendant misstates Ms. Harris' testimony and eschews the content of the conversation. There were three photographic lineups shown to Ms. Harris. The first lineup was the photographic lineup shown to Ms. Harris on August 26, 2012, which contained the picture of Mr. Boudreaux. Ms. Harris did not identify anyone or initial any of the six pictures as being the shooter. The second photographic lineup included a picture of a possible suspect named Cephus Ruffin, shown to Ms. Harris on September 20, 2012. Ms. Harris made no identification on this photographic lineup and, therefore, initialed no picture. The third photographic lineup shown to Ms. Harris on October 17, 2012, was the lineup which contained a picture of Defendant.

The first photographic lineup given to Ms. Harris at trial was the lineup that contained a picture of Mr. Boudreaux, State's exhibit number 15. Ms. Harris' initial response to the question of whether she remembered the lineup was a reasonable response. The viewing of the lineup occurred three years prior to the trial, and it was on the same day her friend was killed on her doorstep. Even though Ms. Harris answered the questions correctly—it was her signature, and she did not initial a picture as being the shooter—it appears from the questions that the State and the trial court may have thought the State had presented Ms. Harris with the photographic lineup which included Defendant's picture. However, when the

19

trial court took over questioning Ms. Harris, it started with State's exhibit number 14, which was the lineup that contained Defendant's photograph. Again, Ms. Harris answered the trial court correctly; yes, it was her signature, and, yes she did initial the picture of Defendant. The same was true when the trial court questioned her regarding exhibit number 7 which contained the picture of Cephus Ruffin; yes, it was her signature, and no, she did not initial any of the pictures.

In *Thomas*, this court determined that the trial court committed reversible error by interjecting itself into the State's case by recapitulating the evidence, highlighting facts relevant in the case, and suggesting to the jury the trial court's view of the facts when it questioned three witnesses in front of the jury. In this case, the trial court removed the jury to clear up any confusion regarding Ms. Harris's identifications in the three photographic lineups. The trial court's action did not indicate an opinion regarding Defendant's guilt or innocence or the credibility of the witness. Following the jury's return to the courtroom, the witness testified regarding the photographic lineups clearly and correctly, as she had during the trial court's questioning.

Defendant also argues that the trial court impermissibly interjected its opinion "when it stated, '[h]ow are you going to overcome [eyewitness testimony]?' (R. at 243)." The comment arose as a result of defense counsel's cross-examination of Detective Sullivan, as follows:

> Q  You also found during the interview that Mr. George had another girlfriend besides Ms. Lange, or at least someone else he was sleeping with at the time?
>
> MS. SIMON:  Objection, Your Honor.  Relevance.
>
> COURT:  Sustained.  Sustained.  Relevancy.
>
> MR. IKERD:  Can we approach then?

20

COURT:  Alright.  Okay.  Remove the jury, please.

. . . .

COURT:  Alright.  Okay.  The jury has been removed. Alright, Mr. Ikerd.

MR. IKERD:  Yes, Your Honor.

COURT:  Whether or not Mr. George had ten girlfriends has no relevancy whatsoever.  Okay?  Absolutely none.

MR. IKERD:  Alright.  Can I make my argument then, Judge?

COURT:  Yes.

MR. IKERD:  It absolutely has relevancy.  The police officers in fact thought it had relevancy.  They investigated the person that he was sleeping with.  They admitted to it.  And her boyfriend because they thought as a possible suspect or at least a possible lead could be jealous boyfriend.  The same way they investigated or at least looked into the drug aspect.  I have a right to put on a defense whether they in fact completed that investigation, and that's what I'm trying to do.  I have a right to draw a reasonable suspicion.  If eventually a juror believe[sic] that one of those leads should have been followed further than it was is absolutely relevant to whether Corey Dyson is the right person.  I'm gonna get to the DNA and I'm gonna get the identification part, but part of our argument is that they didn't go far enough. They didn't finish half of the leads that they had.

COURT:  But they are alleged eye witnesses.  How are you going to overcome that?

MR. IKERD:  I'm gonna go - - sorry, Your Honor.

COURT:  I'm saying alleged.  You know, the jury's not in here.

. . . .

COURT:  Listen, I understand that perfectly well that you have a constitutional right to defend your client.  The fact that Mr. George may have been a drug dealer, may

21

have been - - you understand, has no relevancy in this
instance as far as I'm concerned.

After a long discussion of the relevancy of whether Detective Sullivan investigated Mr. George's girlfriends' boyfriends, Defense counsel objected to the trial court's ruling the question was not relevant.  Later, while defense counsel was objecting to the trial court questioning Ms. Harris, defense counsel alleged that this was the second time the trial court impermissibility interjected its opinion, thus requiring a mistrial.  In brief, Defendant argues that although the jury was not present during the above conversation, the trial court's "comments showed prejudice towards the defense in front of everyone still in the courtroom, including [Defendant's] family, [the victim's] family, and the press covering the case."

First, the trial court's question to defense counsel was not made in front of the jury and, therefore, could not have prejudiced his case.  Secondly, the trial court's question asked during a discussion of relevancy was not a comment on Defendant's innocence or guilt or an expression of the trial court's opinion regarding a material issue.  Moreover, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, risk of misleading the jury, or by consideration of undue delay or waste of time.  La.Code Evid. art. 403;  *State v. Mosby*, 595 So.2d 1135 (La.1992).  Further, the fact that police investigate a potential lead does not necessarily make it relevant for trial purposes.  Absent a clear abuse of discretion, the trial court's determinations concerning relevancy and admissibility should not be overturned.  *State v. Vaughn*, 431 So.2d 358 (La.1982).  Defendant has failed to show that the trial court abused its discretion when it ruled questions concerning Mr. George's girlfriends' boyfriends were irrelevant.

Next, Defendant asserts the trial court prevented him from presenting a defense by not allowing him to attack the credibility of Detective Sullivan's investigation into the shooting. He asserts the police were inept and disregarded potential suspects. He contends that the trial court also erred when it permitted the State's DNA expert to testify to inconclusive results. He argues that considering the inconclusive DNA evidence and the questionable identifications of Ms. Harris and Ms. Lange, if he had been allowed to pursue the defense that the investigation did not seriously consider other suspects, the jury would have found that the State failed its burden of excluding every reasonable hypothesis of innocence. Thus, Defendant argues that he did not receive his constitutional right to a fair trial.

> Both the Sixth Amendment to the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee a criminal defendant the right to present a defense. *State v. Decay*, 07-966 (La.App. 5 Cir. 6/19/08), 989 So.2d 132, 144, *writ denied*, 08-1634 (La.4/13/09), 5 So.3d 161. However, the right to present a defense does not require the trial court to permit the introduction of evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice. *State v. Marsalis,* 04-827 (La.App. 5 Cir. 4/26/05), 902 So.2d 1081, 1088. Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. LSA-C.E. art. 401.

*State v. Gross,* 12-73, 12-826 pp. 14-15 (La.App. 5 Cir. 2/21/13), 110 So.3d 1173, 1182-83, *writ denied*, 13-661 (La. 10/25/13), 124 So.3d 1091.

Defendant argues that "Detective Sullivan's actions of including and excluding suspects from lineups were critical to [Defendant] being charged with this crime." Defendant raised the issue of Detective Sullivan's incompetent investigation in a "Motion for New Trial." The trial court denied the motion prior to the sentencing hearing but allowed Defendant to enter into the record a proffer titled "Memorandum of Offer of Proof."

In brief to this court, Defendant argues that Detective Sullivan dismissed potential suspects for the "most ridiculous reasons." He points primarily to Mr. Boudreaux and Mr. George. Defendant claims that Detective Sullivan never followed through with the investigation of the two men. He claims that Detective Sullivan dismissed Mr. Boudreaux because he was an "immature rapper." However, as noted, Mr. Boudreaux and his girlfriend were interviewed at the police station. A photographic lineup was prepared using Mr. Boudreaux's picture, and Ms. Harris, on the day of the shooting when her memory was still fresh, did not identify Mr. Boudreaux as the shooter. Nonetheless, a search warrant was obtained to search Mr. Boudreaux's and his girlfriend's residence and vehicle and nothing incriminating was found. Defendant points out that it was established at trial that even though the search warrant allowed swabbing for DNA in the car, it was not done. However, according to the police report attached to Defendant's proffer, the vehicle was transported to the police station for examination, and Mr. Boudreaux consented to buccal swabs for DNA analysis. Finally, the jury heard defense counsel's extensive cross-examination of Detective Sullivan regarding the level of his investigation into Mr. Boudreaux as a possible suspect, with the implication that the investigation was inadequate being obvious from the tenor of the questions.

Defendant also argues that the trial court ruled as irrelevant any questions regarding Mr. George's drug activity and any questions, as noted above, about possible jealous boyfriends of the woman or women he was having affairs with at the time. However, Detective Sullivan discussed Mr. George's drug involvement at length. He knew Mr. George was a "low-level" drug dealer and investigated whether there was a possibility that the shooter was looking for Mr. George. Ms.

Lange's and Mr. George's apartment was searched, as were their cell phones, and nothing was found that might have been led to the shooter. Furthermore, buccal swabs were taken from both.

In brief, Defendant argues that the above ruling had a broader impact in that "the ruling was to prevent the defense from asking Detective Sullivan about other suspects that even the Detective thought were relevant enough to investigate." Specifically, Defendant argues that he was prevented from questioning Detective Sullivan about Ronald Weaver, the alleged boyfriend of Mr. George's other girlfriend, and Kenyetta Provost. In Detective Sullivan's report, attached to Defendant's proffer memorandum, it was stated that Mr. Weaver was no longer the boyfriend of Mr. George's girlfriend, was living in Baton Rouge at the time, and did not fit the description of the shooter.

Mr. Provost was considered because he resembled a composite picture provided to the police by Mr. George. However, Mr. Provost had distinctive tear drop tattoos on his face and no one reported seeing tattoos on the shooter's face. Furthermore, Mr. Provost had been arrested on the morning of the shooting and was booked into the Iberia Parish jail at 6:00 a.m. Defense counsel also questioned Detective Sullivan at length regarding a potential suspect, Cephus Ruffin, without objection. Mr. Ruffin was put into a photographic lineup and presented to Ms. Harris as noted above.

Defendant argues:

> On direct, the State made suspects other than [Defendant] a relevant issue by asking about Cody Boudreaux and Cephus Ruffin. Detective Sullivan also stated on direct, "[m]ulitple other suspect were investigated," opening the door to additional suspect. *Compare* (R. at 216) with (R. at 278) (Trial court saying the Detective did not say there were other suspects, demonstrating that the court's ruling was *not* properly based on the testimony that had been given to that point).

25

As noted by Defendant, during direct examination, Detective Sullivan testified:

> Multiple other suspects were investigated. Some information was disseminate[d] just throughout law enforcement. And so calls start coming. One call was from the Lafayette City Police Department on a Kenyetta Provost who was eliminated the following day. A lieutenant with our department who's a career patrolman was familiar with a - - his name was Eric Diggins, I believe, who has kinda had mental issues in the past and lived somewhere on Hummingbird and threatened to shoot Hummingbird up. He was eliminated on September 20[th]. Christine Wall from Probation and Parole called who she had a client who made some very peculiar statements about revocation if he murdered somebody. He was subsequently put in a lineup and also shown to Sandra Harris by myself, and no person was identified.

The latter possible suspect reported by Ms. Wall was Cephus Ruffin.

Following defense counsel's argument to the trial court that he should be allowed to question Detective Sullivan about all of the boyfriends of Mr. George's girlfriends, because it was relevant that the jury should know all possible suspects had been eliminated and for what reasons, the trial court stated:

> COURT: Alright. It's generally well accepted law, Mr. Ikerd, that you can attack the credibility of any witness, you know, of any witness. Now, having said that the witness did not say there were other potential suspects in this case. You asked about whether or not the gentleman had other girlfriends and he said yeah. But does that make the boyfriend of these other girlfriends a suspect? And they discounted out and once they made the hit and got a positive in their mind the idea of who the suspect was, that's were – that's the trail that they followed. And so it's not plausible to say that if he had twenty-five girlfriends then all twenty-five should have been suspect and have the failure to go and check and investigate the twenty-five is lack of due diligence.

It appears from the above statement that the trial court was referring to defense counsel's argument that if Mr. George had several girlfriends, there were multiple potential suspects and that he was entitled to explore each one or allow the jury to see that Detective Sullivan neglected to properly investigate them, not

that Detective Sullivan initially stated there were no other suspects. Citing *State v. Van Winkle*, 94-947 (La. 6/30/95), 658 So.2d 198, Defendant points out that the supreme court "stated that evidentiary rules may not supersede the fundamental right to present a defense. *Id.* (The Court found a reasonable possibility that the excluded evidence might have changed the verdict and its exclusion was not harmless beyond a reasonable doubt. (citing *Chapman v. California*, 386 U.S. 18, 22-23 (1067))." In *Van Winkle*, the defendant was convicted of killing her twelve-year-old son. On appeal, the defendant argued the trial court erred when it denied her the opportunity to present a defense by not allowing her to cross-examine her accusers. The defendant's defense theory was that her roommate was homosexual and that he and a boyfriend killed the boy while having sex with him. She argued:

> [S]he complains that the trial court erroneously prohibited her from asking Darrell questions about his sexual orientation and activities, as well as his source of income; from asking the State's chemist, Ms. Williams, why the absence of sperm in the anal swabs containing seminal fluid did not necessarily disprove sexual intercourse; from questioning the deputy coroner, Dr. Garcia, about the condition of the victim's anal orifice, in order to show recent sexual conduct; from asking Keith Hebert, a bartender at The Roundup, what he meant by describing the bar as a "hustler" bar; and from asking Ken Petite, another Roundup bartender, if the bar's clientele was predominantly gay or if men met other men there. The Court of Appeal found no error in restricting the cross examination of Darrell as "there was no proof that any type of homosexual activity had occurred[.]" The Court also found the restricted questioning of the State's chemist proper, as she was allowed to testify that a man may ejaculate without leaving sperm, owing to medical problems. In short, the Court found no support of the claimed limitations on cross examination or interference with Ms. Van Winkle's right to present a defense.

*Id.* at 201 (footnote omitted).

The supreme court agreed with the defendant, stating:

> The facts here are quite simple. A 12-year-old boy was murdered at home; his body appeared to be penetrated anally, and his underwear was stained with blood. Analysis of the oral and anal swabs yielded, in our view, confusing results. The defense showed

that Darrell was an unrelated male living in the victim's home, was not sexually involved with the boys mother and was present at the time of the murder. From this the defendant theorized that he is homosexual and that he, along with a homosexual partner, killed the boy. The defense tried to show from the autopsy that the victim was the target of homosexual activity. It also tried to show that Darrell frequented gay bars, and successfully placed him in such a bar on numerous occasions in the company of and leaving with another adult male. A defense witness testified that he saw this other adult male leaving the victim's apartment on the morning of the murder.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La.C.Ev. art. 401. On this record, we are constrained to find that the contested portions of Ms. Van Winkle's questioning of Ms. Williams, the State's chemist, Dr. Garcia, the deputy coroner, and Darrell Hurst, the lead fact witness, were relevant to establishing her defense theory. By abridging the cross examination of these witnesses, the trial court impaired Ms. Van Winkle's constitutional right to present a defense. *Chambers v. Mississippi*, [410 U.S. 284, 93 S.Ct. 1038 (1973)]; cf. *State v. Mosby*, [595 So.2d 1135 (La.1992)].

We are also constrained to find a reasonable possibility that the excluded evidence might have contributed to the conviction, and its exclusion was not harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 22-23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Given the equivocal nature of Ms. Van Winkle's statements and of the forensic evidence, the State's case was circumstantial; the defense theory, if properly presented, may well have been sufficient to plant reasonable doubt in the jury's mind. For these reasons, the conviction must be reversed and the case remanded for a new trial.

*Id.* at 202.

In the current case, Defendant asserts that he was misidentified and that investigating Mr. George's girlfriends' boyfriends, Mr. George's drug activity, or the whereabouts of Mr. Boudreaux on the morning of the shooting were plausible lines of defense he was erroneously denied. However, unlike *Van Winkle*, where the facts of the case certainly pointed to the defendant's defense theory, in the current case, the trial court noted there were alleged eyewitness testimonies and DNA evidence that pointed to Defendant. Moreover, had the shooter been a jealous boyfriend or a man angry over a drug deal Mr. George may have been

28

involved with, the shooter had his opportunity the morning before when Mr. George left his apartment with him to help boost his vehicle. Of the remaining allegedly potential suspects discussed in Defendant's brief, Defendant has failed to show how continuing investigation would have offered him a plausible defense.

We find that the trial court did not abuse its discretion when it found the line of questions asked of Detective Sullivan irrelevant and inadmissible. Defendant has not only has failed to show that Detective Sullivan overlooked any evidence capable of casting reasonable doubt on the State's case, but Defendant failed to show that Detective Sullivan neglected to investigate plausible lines of defense.

Finally, Defendant asserts the trial court erred when it ruled that Ms. Guidry could testify as an expert DNA analyst. He argues the trial court failed its gatekeeping function as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). The rule regarding the admissibility of expert testimony provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. La.Code Evid. art. 702. In *State v. Ledet,* 00-1103, pp. 18-20 (La.App. 5 Cir. 7/30/01), 792 So.2d 160, 172-73, *writ denied*, 01-2451 (La. 9/30/02), 825 So.2d 1185, the fifth circuit stated:

> Scientific evidence should be admitted whenever the court's balance of the probative value and the prejudicial effect results in a determination that the evidence is reliable and helpful to the triers of fact. Admission of the scientific evidence is within the discretion of the trial judge. [*State v.*]*Quatrevingt,* [93-144 (La. 2/28/96),] 670 So.2d [197] at 204[, *cert. denied*, 519 U.S. 927, 117 S.Ct. 294 (1996)].

> With regard to the relevance of DNA testing, LSA-R.S. 15:441.1 provides:

Evidence of deoxyribonucleic acid profiles, genetic markers of the blood, and secretor status of the saliva offered to establish the identity of the offender of any crime is relevant as proof in conformity with the Louisiana Code of Evidence.

It is clear from this provision that the Louisiana legislature intended DNA evidence to be admissible absent a showing that the evidence is unreliable. Thus, the first part of the *Daubert/Foret* analysis, the question of relevancy is satisfied. Louisiana courts have recognized that DNA typing is sufficiently scientifically reliable to cross the admissibility threshold. In addition, both Federal and other State courts have found that, in general, DNA profiling is a reliable technique and is admissible. *Quatrevingt*, 670 So.2d at 204.

The reliability of scientific evidence is to be ensured by a requirement that there be a "valid scientific connection to the pertinent inquiry as a precondition to admissibility." This connection is to be examined in light of a "preliminary assessment" by the trial court "of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts at issue." [*State v.*] *Foret*, 628 So.2d [1116, (La.1993)] at 1122, citing *Daubert, supra*. In considering whether scientific evidence is reliable, the trial court should consider the following factors suggested in *Daubert*:

(1) The "testability" of the expert's theory or technique;

(2) Whether the theory or technique has been subjected to peer review and publication;

(3) The known or potential rate of error; and

(4) Whether the methodology is generally accepted in the scientific community.

*Daubert,* 509 U.S. 579, 113 S.Ct. at 2796-97.

Prior to the State's proposed expert witness testifying, defense counsel advised the trial court that he desired to conduct a traversal of the witness and introduce his own expert to be qualified by the trial court. The trial court removed the jury. The State introduced Ms. Guidry, who testified that she was employed with ACL as a forensic chemist in the biology section as a DNA analyst. Ms.

Guidry submitted her curriculum vitae to the court. She testified that she has worked with ACL since 2005, first as a technician and then since 2009 as a DNA analyst. Ms. Guidry testified that she has qualified as an expert in several Lafayette, Vermilion, and Iberia Parish courts, including district, municipal, and federal courts.

On traversal, Ms. Guidry expanded on her education, which culminated in a Master of Science degree with a concentration in Forensic DNA and Serology through the University of Florida. She testified that she has had training in the science of human genetics from molecular genetics, population genetics, and statistics. She agreed she was not board certified in any of these sciences, had not done any independent research in any of these areas, and had not published any articles for peer review purposes. However, she testified that all the work on DNA analysis in the laboratory is reviewed by a qualified DNA analyst. She further testified that "[t]he technical leader produces the guidelines which are then reviewed and each analyst in this section must demonstrate competency using these protocols and guidelines." She was not involved in developing the guidelines. The guidelines were based on validation studies. She testified that she and ACL were accredited by an organization called ANAB which stands for ANSI-ASQ National Accreditation Board, and ANSI and ASQ stands for American Society of Quality, since 2001.

Defendant then introduced his own expert witness, Dr. Acton, who was currently retired but still active in the scientific community as a consultant. He testified that he has a Ph.D in microbiology and immunology from the University of Alabama. Dr. Acton has done independent research and had been a director of a research laboratory in immunogenetics DNA diagnostics. Dr. Acton testified that

31

he had been retained as an expert witness in forensic DNA analysis several times in Louisiana. Dr. Acton also provided the trial court with his curriculum vitae.

Following testimony of his extensive qualifications, Dr. Acton opined that Ms. Guidry did not have the qualifications to be an expert DNA analyst because she held only a master's degree. He stated that in any of his laboratories she would only be able to hold the position of supervisor or technician. He further stated that ACL should not be considered accredited because the director did not hold a doctorate's degree. However, he did admit that the ACL was accredited by the American Society of Crime Laboratory Director's Laboratory Accreditation Board, which is required by the Federal Bureau of Investigation before the crime laboratory can access CODIS.

The trial court then ruled:

COURT:

All right. Thank you, sir. All right. The Court finds that Ms. Clare Guidry is an expert in forensic DNA and will except her as such. She's been previously qualified in this district by her own testimony several times as well as in the Federal Court, and the consideration of the Court must accept as to whether or not the expert is an expert is - - whether or not the witness is qualified to express an expert opinion and whether the facts upon which the expert relies are the same type as relied upon by other experts in the field. And also, whether in reaching his conclusion or her conclusion the expert used well-founded methodology. And fourth, assuming that the expert testimony passes these tests, whether the testimony is potential for unfair prejudice substantially outweighs its probative value under the relevance rule. So, the Court thinks that Ms. Guidry is well qualified to be an expert and of course, Mr. Ron will be accepted as an expert for the defense.

In brief, Defendant argues only that the trial court allowed Ms. Guidry to be qualified as an expert in forensic DNA analysis, over the defense's objection. One of the reasons given by the court was that Ms. Guidry had been qualified in the

Fifteenth Judicial District previously as an expert; therefore, she should be qualified again in this case. Defendant goes on to argue:

> [T]he guidelines used by ACL are scientifically questionable. Ms. Guidry did not create the guidelines and cannot independently verify that they are correct—she does not have the scientific skills to prove her conclusions are correct, only they are "possible."

Defendant asserts that unless there is a complete "match" with the suspect's profile, the evidence is misleading. He argues:

> Forensic DNA labs primarily test mixture and unknown profile samples that push the limits of scientific understanding and technology—which was also a critical question under the *Daubert* standard that was not addressed by the trial court. The nature of forensic DNA analysis does not change the fact, however, that ACL is using applied sciences with specific laws and rules in ways they were never intended."

In brief, Defendant contests only the qualification of Ms. Guidry to testify to the conclusion derived from the testing procedures. Despite an allegation otherwise, Defendant did not prove that the methodology underlying Ms. Guidry's conclusion was not scientifically valid. In *State v. Hampton,* 15-1222, p. 15 (La.App. 4 Cir. 12/23/15), 183 So.3d 769 777, *writ denied,* 16-124 (La. 3/14/16), 189 So.3d 1073, the supreme court stated:

> In light of the unique and powerfully persuasive aspect of DNA evidence, the trial judge's gatekeeping obligation to ensure that the scientific evidence is not only relevant but, more importantly for our purposes here, also reliable, cannot be understated. A *Dauber-Foret* hearing is appropriate when a defendant raises sufficient issues concerning not the conclusions generated by the testing, but the methodologies utilized to obtain those conclusions. *See Doe v. Archdiocese of New Orleans*, 01-0739, p. 5 (La.App. 4 Cir. 5/8/02), 823 So.2d 360, 364 (internal citation omitted). *See also Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (The focus . . . must be solely on principles and methodology, not on the conclusions that they generate.").

In his opinion report, dated August 14, 2014, Dr. Acton noted that ACL utilized PCR methodology. In *State v. Edwards*, 97-1797, pp. 25-27 (La. 7/2/99),

750 So.2d 893, 909-10, *cert denied*, 528 U.S. 1026, 120 S.Ct. 542 (1999) (footnote

omitted), while discussing the qualification of the testifying expert in DNA

analysis and the reliability of the methodology used to reach his conclusion, the

supreme court stated:

> The state presented affirmative, uncontradicted evidence that Curtis Knox was qualified in DNA analysis and serology. Knox finished first in his class at Iowa State, had been with the North Louisiana Crime Lab at Shreveport for three and one-half years, had done PCR testing at an FBI laboratory, had special training in PCR DNA extraction, had graduate level courses, and, according to Knox, he and the lab had met every TWGDAM (Technical Working Group on DNA Analysis and Methods, a group comprised of scientists and forensic examiners) requirement. Hence, the trial court had a factual basis for concluding that Knox was qualified by reason of education, skill, knowledge and experience. La.Code Evid. art. 702. The defense failed to undermine the state's showing despite its lengthy cross-examination of Knox. The trial court did not abuse its discretion in accepting Curtis Knox as an expert in the field of forensic DNA analysis.

> . . . .

> PCR technology is a means of extracting DNA from very small samples of body tissue. *State v. Spencer*, CR95-208, CR95-328 (La.App. 3 Cir. 10/4/95), 663 So.2d 271, 274. Its use was challenged by the defendant as not satisfying the *Quatrevingt* reliability standard for admission of scientific evidence. Defense did not challenge one of the four enumerated factors--that of general acceptance in the scientific community. Nevertheless, it is important to mention that, according to Knox, almost all molecular or genetic research utilizes the technique. Its use has been accepted in the legal community as well. At least two federal circuit courts have found PCR analysis reliable and admissible under the standards set out in *Daubert. See,* e.g., *United States v. Beasley*, 102 F.3d 1440, 1446-47 (8th Cir.1996), cert. *denied sub nom. Beasley* v. U.S., 520 U.S. 1246, 117 S.Ct. 1856, 137 L.Ed.2d 1058 (1997) (which listed, at 1147, n. 4, fifteen state appellate courts admitting DNA evidence derived from the PCR methodology); *United States v. Hicks*, 103 F.3d 837, 845-46 (9th Cir.1996), *cert. denied sub nom. Hicks v. U.S.*, 520 U.S. 1193, 117 S.Ct. 1483, 137 L.Ed.2d 694 (1997). A Louisiana court of appeal has also found reliable DNA evidence based on PCR methodology. *State v. Spencer,* CR95-208, CR95-328 (La.App. 3 Cir. 10/4/95), 663 So.2d 271.

In *Hampton*, 183 So.3d at 776, the supreme court stated, "It is well established that the trial court is afforded wide discretion in determining whether expert testimony should be admitted and who should or should not be qualified as an expert. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed. 2d 508 (1997) (the standard of review for a trial court's ruling on whether to admit or exclude expert testimony under *Daubert* is abuse of discretion)[.]"

In the current case, Defendant claims Ms. Guidry's conclusion that Defendant cannot be identified as a contributor to the mixed, partial DNA found in the two gloves, but that he cannot be exclude either, is misleading. The trial court heard Dr. Acton's lengthy testimony and evidently concluded that Ms. Guidry's knowledge, skill, experience, training, or education was sufficient in this case. While Ms. Guidry's testimony that Defendant could not be excluded as a contributor to the mixed, partial DNA profile was prejudicial to Defendant's case, so was her testimony that he could not be positively identified prejudicial to the State's case. Defendant has failed to show the trial court abused its considerable discretion when it allowed Ms. Guidry to testify as an expert witness.

There is no merit to this assignment of error.

**DECREE**

Defendant's conviction and sentence are affirmed. However, the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of the opinion and to file written proof in the record that Defendant received the notice. Additionally, the trial court is be ordered to correct the sentencing minutes to reflect that Defendant's sentence is to be served at hard labor.

**CONVICTION AND SENTENCE AFFIRMED;**

**REMANDED WITH INSTRUCTIONS.**